STATE v. LORRAINE JAMIESON.[1]

November 14, 1941.

No. 33,006.

*F. Gordon Wright,* for appellant.

*R. S. Wiggin,* City Attorney, and *Leo P. McHale,* Assistant City Attorney, for the State.

JULIUS J. OLSON, JUSTICE.

Convicted of violating an ordinance, defendant appeals from the judgment and from an order denying her motion for new trial.

Defendant was licensed under the "Minneapolis Non-intoxicating Liquor Ordinance" to sell 3.2 beer. The ordinance (§ 25) provides:

"It shall be unlawful for any [such] licensee * * * to *suffer* or *permit*" upon the licensed premises *"any mixing or spiking* of malt liquor, *soft drinks"* or any other beverage "by adding to or *with* the same any * * * *intoxicating liquor."* Nor may the licensee "sell or serve non-intoxicating liquor to any intoxicated person" or "permit" such persons "to remain upon" the licensed premises. (Italics supplied.)

Defendant's motion for new trial before the trial court was based upon the following grounds: (1) Error in the denial of her "motion for dismissal at the close of plaintiff's testimony * * * upon the ground that the plaintiff had failed to * * * produce sufficient evidence to sustain the charge of having permitted spiking in a place licensed for the sale of 3.2 malt beverages"; (2) that the "decision is not justified by the evidence"; and (3) that it "is contrary to law."

■ The first assignment is clearly unavailing, since we have held in many cases that a new trial will not be granted for refusal to dismiss when the state rests if the evidence as finally in warrants the conviction. Our latest case is State v. Hokenson, 211 Minn. 70, 300 N. W. 193, where some of our prior cases are cited.

■ The remaining assignments may be disposed of together. A brief resumé of the evidence relied upon for conviction should be made.

Three visits to defendant's place of business, known as "Dixie's Inn," were made by two police officers, two during the late evening of April 5, 1941, and the third shortly after midnight Sunday morning, April 6. They ordered "setups." On at least one of these occasions "the cokes [setups] were delivered to the booth" occupied by them, while they had a bottle of whiskey "sitting on the table," "in plain sight"; "it was there when the cokes were delivered, and after spiking too." They were charged and paid "ten cents each for these cokes," while "the usual market going price is but five cents." There were many people in the place, estimated at 20 to 30. On each visit, a little more than an hour apart, similar procedure was followed, although different booths, less conspicuously located than the one to which we have just referred, were occupied by the officers. Shortly after the third visit and under the direction of a third officer, Mr. Hillner, the two who had first visited the place were directed to arrest defendant. This was done. Officer Hillner upon entering the place there found a number of persons "pretty well intoxicated." Several of them were "put out of the place" because "they were drunk, dis-

orderly and noisy." He searched one of the booths and found an empty whiskey bottle on the floor. In another booth "there was a drunken Indian woman * * * also five other people sitting in the first booth." The empty whiskey bottle was "in the center booth, lying up against the wall." Officer Hillner testified that he "took out the whiskey bottle, and I also took three glasses off of that particular booth where the five people were, but there was nothing in them except the smell," the smell being "of whiskey and coke." There are other items of evidence that might well be recited, but we think enough has been said to justify the court's findings and conclusion that "the evidence shows that the two officers occupied a front booth, and that the bottle was left upon the table where it could be very easily seen"; and that "the occupancy of a conspicuous booth, and leaving the bottle upon the table during the operation of spiking was sufficiently open and notorious to charge the defendant with [guilty] knowledge" of what was going on.

■ It is well established under our decisions that violations of an ordinance need not be proved beyond a reasonable doubt. State v. Nelson, 157 Minn. 506, 507, 196 N. W. 279; City of St. Paul v. Keeley, 194 Minn. 386, 388, 260 N. W. 357. In State v. Robitshek, 60 Minn. 123, 124, 61 N. W. 1023, 33 L. R. A. 33, it was said:

"It has repeatedly been decided by this court, as it has elsewhere, that municipal ordinances are not criminal statutes; that violations thereof are not crimes, nor are such violations governed by the rules of the criminal law, save in certain specified exceptional particulars."

So also in City of Red Wing v. Nibbe, 160 Minn. 274, 275, 199 N. W. 918, it was held:

"It has long been settled that the violation of a city ordinance is not a criminal offense against the state, but only against the municipality enacting the ordinance, and that the provisions for enforcing such ordinances and for prosecuting violations thereof

▇▇▇▇▇▇▇▇▇▇

need not conform to the provisions for prosecuting violations of the state laws." (Citing numerous cases.)

■ "Suffer," as applied to the operation of gambling machines, "is synonymous with the word 'permit,' and both imply knowledge of the thing suffered or permitted." "To 'suffer' an act to be done by a person who can prevent it is to permit or consent to it; to approve of it, and not to hinder it." 40 Wd. & Phr. (Perm. ed.) 597. We think a person "suffers" an act to be done when, although possessed of power to act and duty requires action, he fails to act. In such circumstances the word "suffer" is synonymous with "permit" or "consent," to "approve of," and "not to hinder."

Here, obviously, defendant could *prevent* both "mixing and spiking." It was her duty to do so. The kind of place she operated bespeaks lack of vigilance on her part as well as that of her barkeepers to *prevent* what the ordinance says is not to be suffered or permitted.

Judgment and order affirmed.

