### STATE v. HELEN GLENNY AND OTHERS.[1]

October 30, 1942.

No. 33,297.

[1]Reported in 6 N. W. (2d) 241.

*A. M. Cary* and *Alex M. Kanter*, for appellants.

*R. S. Wiggin*, City Attorney, and *Leo P. McHale*, Assistant City Attorney, for the State.

GALLAGHER, CHIEF JUSTICE.

Defendant Glenny was convicted of keeping, and the other defendants of being found in, a disorderly house in violation of an ordinance of the city of Minneapolis. The cases were tried together. The evidence offered by the state consisted of these undisputed facts:

Shortly after 11 o'clock in the evening of April 25, 1942, Officer Greaves of the Minneapolis police force called at an apartment referred to as "Apartment G" in a building located at 8 East Fourteenth street in that city. He rapped on the door and was admitted by defendant Glenny. Greaves stated that "a cab driver had sent me up there." Miss Glenny told him "to go back and have the cab driver call her." Greaves left the apartment and returned some time later. He did not see the cab driver. Upon the second call he was admitted to the apartment by defendant Betty Marshall. Greaves, Miss Glenny, and Miss Marshall entered a room "across from the entrance." There was a chair and a bed in the room. Greaves testified:

"Q. Did you then and there have a conversation with Miss Glenny?

"A. Yes.

"Q. State what was said and what she said.

"A. She said she had to have ten dollars for two girls and I asked about the price and finally said the cab driver—.

"Q. What did you ask about the price—, what were the words you gave?

"A. I was told ten dollars for two girls and I asked—, argued that it was too much. That five dollars is the price I understood

from the cab driver, and I was informed that she was talking to me and not the cab driver.

"Q. Go ahead.

"A. At that time Betty went out of the room, and the rest of the Moral Squad came in."

The other members of the Moral Squad participating in the raid were Officers Hart and Dahl. Dahl entered the apartment by "kicking the door down" after defendant Marshall refused to permit him to enter. Officer Hart followed shortly afterward. There was very little conversation after the arrival of Officers Hart and Dahl. At the time of the so-called raid, defendants Phillip Bengen and Henry Davis, in company with another girl, Lois Farrell, were seated at a table in the dining room. Drinks of an unidentified kind were being served to the men. Three other men entered the apartment after the arrival of the officers, but they were not held.

There was no evidence of the reputation of the place or that previous complaints had been made against it and, other than the facts referred to, nothing to indicate that boisterousness, lewdness, or drinking occurred therein at any time. It does not appear that the apartment had been frequented in the past by persons of immoral character. The raid in question was apparently made on a telephone tip received that night. Miss Glenny and Miss Marshall were attired in slacks. There was no showing that Miss Farrell was not properly dressed. The apartment was described by Officer Hart as follows:

"It was very well furnished. Very nice furniture. It was a bedroom off the kitchen, there was a hall that led to the dining room from the front door and other rooms entering off this hall—, go down straight and off the hall was one in this way (indicating). Another bedroom off the other end and there was a telephone in the hall."

The only question presented is whether the evidence is sufficient to sustain the convictions. The commission of single or isolated disorderly or immoral acts on the premises does not constitute the

place a disorderly house within the meaning of the penal laws. State v. Reckards, 21 Minn. 47; State v. Nanick, 144 Minn. 413, 175 N. W. 693. In the latter case we said:

"To establish the offense of keeping a disorderly house, it must appear that acts injurious or offensive to the public are habitually permitted on the premises, or that the house is conducted as a place to which people may and do resort for the purpose of indulging in immoral or unlawful practices. But it is sufficient if, when the character of the culpable acts and the circumstances under which they were committed is taken into account, it appears that they were repeated often enough or were continued long enough to warrant an inference that the house was kept for the indulgence of such practices."

The rule was stretched about to the limit in City of St. Paul v. Mahmood, 198 Minn. 229, 269 N. W. 408. There, however, the facts were more persuasive of guilt than here.

We recognize that these prosecutions are under a city ordinance and that the same degree of proof is not required as in prosecutions for violation of a statute under an indictment or information. City of St. Paul v. Keeley, 194 Minn. 386, 260 N. W. 357; City of St. Paul v. Mahmood, *supra*. The convictions must be sustained, if at all, on the conversation between Miss Glenny and Officer Greaves in which a somewhat indefinite and unaccepted proposal was made to furnish two girls at a fixed price. If this evidence was supported by evidence of other circumstances sufficient to warrant an inference that the house was actually kept as a disorderly house and for immoral purposes, the convictions could be sustained. The other circumstances appearing here are as consistent with innocence as they are with guilt. This being so and there being no evidence as to the character or reputation of the place, we believe that the state has failed to sustain the conviction of defendant Glenny within the rule of State v. Reckards, 21 Minn. 47, and State v. Nanick, 144 Minn. 413, 175 N. W. 693. It follows that the other convictions based upon the same evidence cannot stand. Persons accused of operating or being found in dis-

orderly houses have the right to be tried under established rules of law and cannot be convicted on evidence which falls short of the requirements of these rules.

The judgments of conviction are reversed and new trials granted.

STREISSGUTH, JUSTICE (dissenting).

Were this a charge requiring proof beyond a reasonable doubt to sustain a conviction, I might readily concur in the decision of the majority. In criminal proceedings an appellate court must, of necessity, weigh the evidence at least to the limited extent of determining whether it meets the stringent requirements of the reasonable doubt rule. But violations of city ordinances are not crimes, and upon appeal from a conviction thereunder our only concern should be, as in civil cases, whether, considering the evidence in the light most favorable to the prevailing party (in this case the state), there is any evidence reasonably tending to sustain the decision of the fact-finding tribunal below, whether trial court or jury.

The lower court here had a right to draw its own inferences from the testimony. The fact that defendant Glenny at first refused admittance to her apartment to the plain-clothes man without his having had the cab driver call her; that she later admitted him shortly before midnight without such a call notwithstanding that he was a stranger, that he staggered, and that he was apparently intoxicated; and that she then led him into a bedroom and bartered with him for two girls certainly smacks of commercialized vice. Judge Anderson, experienced in police court work and not as naïve as the average juror, undoubtedly deduced from these facts that when defendant Glenny said that "she had to have ten dollars for two girls" she was not offering them for war work but for the purposes of prostitution. To borrow from the lexicon of the ancients, it was fair to infer that she, for a price which appeared reasonable to her, was seeking to convert her revelous intruders from disciples of Bacchus to followers of Aphrodite and to lead them from the vineyards of Olympus to the lascivious groves of Cyprus.

Following State v. Nanick, 144 Minn. 413, 175 N. W. 693, 694, I am of the opinion, as this court was in that case, that "in the absence of any contradiction or explanation, * * * the facts testified to justified the [trial] court in concluding that defendant was keeping a disorderly house."

The convictions of all defendants should be sustained unless we are to assume the role of triers of facts, a function which I have always considered *ultra vires* an appellate court.

PIRSIG, JUSTICE (dissenting).

I concur in the dissent of Mr. Justice Streissguth.

