## STATE v. CHARLES WILSON, JR.[1]

April 22, 1955.

No. 36,515.

---
[1]Reported in 69 N. W. (2d) 905.

*Briggs, Gilbert, Morton, Kyle & Macartney* and *Frank J. Hammond,* for appellant.

*Charles A. Sawyer,* City Attorney, and *Leo P. McHale,* Assistant City Attorney, for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a judgment and sentence of the municipal court of Minneapolis.

On the afternoon of Tuesday, July 6, 1954, the complaining witness, a 12-year-old girl, was riding her bicycle in a southerly direction on East Lake Harriet boulevard in Minneapolis. She had just come from Lake Calhoun and was on her way home. She claimed that at about Forty-fourth street she was stopped by a man in a green convertible Buick automobile. She said that he asked her directions to Lake Calhoun; that she told him which way to go; and that she then noticed that he was exposed. She said that she then started to ride away; that he followed her in his car and again inquired about directions; and that he asked her an obscene personal question. She said that she then rode away; that as she did so she turned around and looked at the front where it said the kind of car and noted the license number, 800-264; and that she did not write the number down but continued to ride to her home about eight blocks away. She said: "I kept telling it [the license number] to myself, and as soon as I got home, I told it to my mother." She testified that the incident complained of happened between 4:30 and 4:45 on the day in question. She did not look at the clock when she arrived home nor did she know what time it was when she left Lake Calhoun, but she said that her mother told her that it was around five o'clock in the evening when she arrived home. She thought that it may have taken her about ten minutes to ride from the place where the incident occurred to her home eight blocks away. Upon her arrival at home she told her mother what happened, and her mother notified the Minneapolis police. The witness said that Detectives Ennen and Cosgrove came to her home that same day but that she was unable at that time to describe the man she had seen. She also recalled that Detective Ennen came out to see her again on the following Thursday but that she did

not especially remember what he said except that he asked her if she was sure about the license number and that she said she was.

Defendant testified that he first heard of this matter about 9:30 a. m. on Friday, July 9, when Detective Cosgrove telephoned him and asked him to come over to the Bryant avenue police station in Minneapolis. Defendant went to the station that afternoon and had a conference with the two detectives. On the following morning he voluntarily returned to the Minneapolis station with his wife and submitted himself to an identification by the girl. He said that at that time, after having been observed by the girl, Detective Ennen told him "It doesn't look too good." He asked the detective what he meant by that and he claims Ennen replied: "Well, she thinks it is you, but she is not sure." This testimony was not refuted by Detective Ennen since he was not called as a witness.

Defendant again voluntarily returned to the police station on Monday, July 12, and was arrested that afternoon. The complaint charged him with indecent exposure in violation of an ordinance, and defendant was arraigned the next day.

At the trial it appeared that defendant owned a Buick convertible with license number 800-264. The girl identified the car as a green convertible Buick with the top up when she saw it. Defendant said that he was certain the top was down, because he remembered that, when a threatened rain cleared up before noon that day, he lowered the top and left it that way for about a week. His wife testified that when he picked her up about 5:03 that afternoon the top was down. Defendant described the color of the car as extremely dark green, almost black. He said that, while one could tell that it was green, it sometimes looked blue or black depending on how the sun was hitting it.

On the witness stand the girl pointed to defendant as the man who had stopped her. She also claimed that she had identified him at the police station on July 10 and said that she recognized his voice. On direct examination she gave the following testimony:

"Q. Did you get a good look at the man that was seated in the car?

"A. I didn't get a good description of him. I saw him.

"Q. You saw him?

"A. Yes.

"Q. Now, you see the man here that we call the defendant. What do they have in common that you remember, that you recognize, the two men as to being one and the same?

"A. Well, I am not sure. His face looks like the man.

"Q. Looks like the man. Is there anything that stands out that you remember more than anything else?

"A. No.

"Q. You are positive, are you, that it is the same man?

"A. Yes, I am."

Upon cross-examination she said that she looked at the license number long enough so that she knew what it was; that she was frightened at the time; and that she did not know what color trousers the man was wearing or the color of his shirt nor whether he was wearing a jacket, coat, necktie, or hat. She did not know the color of the seat covers or the upholstery in the car and did not know whether the car had white-side-wall tires or not, but she said that she thought the numbers on the license plate were black with a sort of light cream-color background.

Defendant is an airplane pilot employed by a lumber company. He testified that he flies a plane owned by the company and used by a number of affiliate companies and that he has been so employed for eight years. He and his wife live at Highland Village in St. Paul. He testified that he had been out of town from June 16 until July 6, the day in question; that he arrived at the company's office on the 24th floor of the First National Bank building in St. Paul at approximately 3:30 that afternoon; that upon his arrival at the office he opened some mail which had accumulated during his absence; and that sometime after four o'clock that afternoon he left the office, went down in the elevator, and picked up his car which was parked on Fifth street in St. Paul. He claims that he then drove to Robert street in St. Paul, turned left, followed Robert street to University avenue, went down University avenue to where it joins Washington

avenue in Minneapolis, then went down Washington avenue to Second avenue south, then to Fourth street, where he made a left-hand turn and drove to the corner of Third avenue and Fourth street, where he picked up his wife within two or three minutes after 5 p. m. He said that he and his wife then proceeded from that point to Highland Village in St. Paul, where they arrived at approximately 5:30 p. m.

The wife of defendant corroborated his testimony with reference to meeting him. She said that she left the office of the telephone company where she is employed at five o'clock that day; that it took just a few minutes to get to the corner where he picked her up; and that he was there when she arrived. She also said that they went from there to Highland Village where defendant's brother was working and that her husband was wearing a dark gray summer suit that day, as well as a hat.

Defendant's brother testified that he was engaged in the excavating business in the Highland Park vicinity and that he saw defendant and his wife in that locality at just 5:30 on the afternoon of July 6. He fixed the time by the fact that he had unloaded a machine which he had used on a small job at 5:30 that day and that the time was fixed in his mind because it was the quitting hour.

Blanche Klingman, an employee of the lumber company which also employed defendant, testified that she saw defendant at the company's office on the 24th floor of the First National Bank building in St. Paul shortly after four o'clock on the afternoon of July 6.

Alexander Helmick, the treasurer-comptroller of the lumber company, also said that he had seen and had spoken to defendant in the office of the company in the late afternoon of the day of the alleged incident.

David Klingman, another employee of the company, also remembered that he had seen defendant in the company's office in the late afternoon of the day in question. He said that he remembered it because defendant had been out of town for a while; that while he is away "he gets quite a lot of mail, and a considerable amount of it is left on my desk"; and that he had been waiting for defendant to come in that day to get the mail as it was in his way.

Klingman, Helmick, and R. E. Saberson, a merchandising counselor, all of whom had ample opportunity to observe defendant in his work and acquaint themselves with his reputation, testified that his reputation for decency and propriety of behavior was the very highest.

The trial judge found defendant guilty of violating the disorderly conduct ordinance (Minneapolis City Charter and Ordinances [Perm. ed.] 37:9-4). It reads in part:

"Any person who shall appear in any street or public or exposed place in said City, in a state of nudity, or in a dress not belonging to his or her sex, or in any indecent or lewd dress, or shall make any indecent exposure of his or her person, or be guilty of any obscene or filthy act, * * * shall be guilty of a violation of this ordinance * * *."

At the conclusion of the trial and before passing sentence, the trial judge gave his reasons for his decision. With his usual thoroughness and sincerity, he indicated that he was impressed with the intelligence of the young girl making the accusations and with her clear observations. He felt that it was completely possible and probable that the child did see the license number on the car and that she was intelligent enough to remember it even though she had not written it down. In addition to that, the judge stated that he was very much impressed with the description of the car and with the identification she had made of defendant. It was the opinion of the judge that the state had proved its case by a fair preponderance of the evidence and that defendant was guilty as charged.

This court repeatedly has held that violation of a municipal ordinance need not be proved beyond a reasonable doubt. State v. End, 232 Minn. 266, 45 N. W. (2d) 378; State v. Jamieson, 211 Minn. 262, 300 N. W. 809; State v. Nelson, 157 Minn. 506, 196 N. W. 279. We have recognized that these prosecutions are under city ordinance and that the same degree of proof is not required as in prosecutions for violation of a statute under an indictment or information. State v. Glenny, 213 Minn. 177, 6 N. W. (2d) 241; City of St. Paul v.

Keeley, 194 Minn. 386, 260 N. W. 357. That being so, it follows that the civil rule of a fair preponderance of the evidence must apply.

We have carefully considered this case and the record before us, and it is our opinion that the state did not establish by a fair preponderance of the evidence that defendant violated the ordinance in question. While we have every confidence in the sincerity of the little girl, an examination of the record in its entirety shows so many conflicts in the testimony as to satisfy us that the violation charged was not proved by a fair preponderance of the evidence. For example, she said that she first identified defendant at the police station about four days after the alleged violation. Defendant claims that when they were at the police station that day Detective Ennen told him that she was not sure. In view of the fact that the detective was not called as a witness, under the circumstances here we must presume that he would have testified adversely to the state. When a party fails to call an available witness possessing peculiar knowledge of the facts of the case, a presumption arises that, if the witness had been called, his testimony would be unfavorable to such a party. 7 Dunnell, Dig. (3 ed.) § 3444, and cases cited.

While it seems almost uncanny that a youngster of that age could glance at a license number while in a frightened condition and ride eight blocks to her home and still be able to remember a number of six figures, we cannot get away from the fact that the car she described as a green convertible Buick corresponded in description with the car owned by defendant. However, outside of that description, the girl testified that she did not get a good description of the man as she saw him in the car; that she was not sure but that defendant's face looked like the man she saw; and that there was nothing about him that she remembered more than anything else except that she recognized his voice and that she was positive that he was the man. It must be recalled that she knew nothing about the color of the clothes the man had on or whether he was wearing a jacket, a coat, a necktie, or a hat. Neither did she know anything about the color of the seat covers or the upholstery in the car, although she claims to have looked inside the car, nor did she know whether the car had white-side-wall tires. She said that she was

unable to describe the man whom she had seen when detectives first questioned her at her home. It was not until she went to the police station and was confronted alone with defendant, without any "line up," that she said that he was the man, although, according to defendant, Detective Ennen said that she was not sure.

To offset her testimony, we have testimony which would seem to make it impossible for defendant to have been where she claims he was at the particular time involved. Employees of the company where he worked testified that he was seen on the 24th floor of the First National Bank building in St. Paul in the late afternoon and after four o'clock on the day in question. There is also testimony on the part of defendant and his wife that he picked up his wife near the telephone office on Third avenue and Fourth street in Minneapolis about 5:03 in the afternoon in question and that he was out at Highland Park in St. Paul by 5:30 that afternoon. True, this testimony as to picking up his wife and being at Highland Park is furnished by defendant, his wife, and his brother. However, even granting for the sake of argument that defendant was at the place the little girl claims he was between 4:30 and 4:45 that afternoon, it seems incredible that he could have left the 24th floor of the First National Bank building at or shortly after four o'clock that day, have gone down to Fifth street in St. Paul to get his car, have gone out to Lake Harriet by 4:30 or 4:45, and still have gotten downtown in Minneapolis to pick up his wife at 5:03. In view of all the circumstances of this case, we are compelled to say that in our opinion the state's evidence did not preponderate.

Reversed.