STATE v. H. J. MINAR COMPANY.

81 N. W. (2d) 268.

February 21, 1957—No. 36,920.

---

[4]Lockwood v. Exchange Bank, *supra;* In re W. C. Allen & Co. (W. D. Va.) 134 F. 620; In re Brumbaugh (D. Pa.) 128 F. 971.

*Ryan, Kain & Mikan,* for appellant.

*Charles A. Sawyer,* City Attorney, and *Leo P. McHale,* Assistant City Attorney, for respondent.

KNUTSON, JUDGE.

This is an appeal from a judgment of the municipal court of Minneapolis.

Defendent was convicted of a violation of § 4 of the "Dealers in Used Motor Vehicles" ordinance (Minneapolis City Charter and Ordinances [Perm. ed.] 33:57-4) which, as far as material to this case, reads:

"Every such dealer in used motor vehicles shall at the time of any sale or sales give and furnish to the purchaser of a used motor vehicle a plainly written statement signed by him showing all of the terms and conditions of such sale, the date thereof, the purchase price and whether on terms or in cash (if on terms the exact terms shall be stated), the motor number, the factory year model, and the serial number of such used vehicle."

The complaint charged defendant company with a violation of the ordinance for having sold a used automobile to complainant Fred N. Peterson and his wife on October 27, 1955, without having given to

them a written statement showing the terms of the sale as required by the ordinance. Defendant contends that no sale was consummated between the parties; therefore that there was no violation of the ordinance.

The pertinent facts may be briefly stated. On or about October 19, 1955, Fred N. Peterson called at defendant's place of business in Minneapolis to look at automobiles there on display. After some negotiation with defendant's salesman, Merideth McClain, Peterson agreed to purchase a 1955 Ford Club Sedan for $2,195. A retail buyer's order was prepared in which payment was shown to consist of an allowance of $195 for Peterson's 1946 Dodge automobile, a cash downpayment of $300, and the balance to be financed in monthly payments. The retail buyer's order, which was subject to defendant's final approval, was signed by McClain and Peterson. Later, as the trial court said in its memorandum, "for reasons not adequately explained," the order was changed in several respects, including an increase in the purchase price to $2,495 and an increase in the allowance for the 1946 Dodge to $495.

Several meetings were held between the Petersons and the representatives of defendant prior to October 27, 1955. The credit rating of the Petersons was investigated, and it was found that Peterson had recently been a bankrupt and was then under probation in the Hennepin County District Court. On account of Peterson's unfavorable credit rating, defendant had difficulty in finding a purchaser for a proposed conditional sales contract covering this sale. On October 26, 1955, McClain went to the Petersons' home and informed them that a downpayment of $500 rather than $300 would be required in order to make it possible to sell the contract because of Peterson's unfavorable credit standing.

On October 27, 1955, defendant's finance manager, Donald R. Rukes, ascertained that Industrial Credit Company would purchase the contract if the purchase were approved by the probation department. The Petersons discussed the matter with Rukes on the evening of October 27. After doing so, they called on Mr. Iverson of the probation department, and his approval of the purchase was communi-

cated to Rukes. Thereafter the testimony of the parties is in complete conflict. The testimony of Rukes is that, after receiving this recommendation from the probation office and while the Petersons were returning to defendant's office from the probation office, he prepared a completed copy of a conditional sales contract on the assumption that the Petersons would make the downpayment on the automobile on their arrival. The Petersons, on the other hand, contend that when they returned they signed a conditional sales contract in blank and that none of the blank spaces were filled in. The trial court, in its memorandum, noted:

"* * * this contract is dated 'October 31, 1955' and there is no indication of an erasure on the two exhibits which are copies of this contract at the place where this date appears."

After considering the conflict in the testimony of the parties, the court accepted the testimony of the Petersons that the contract was signed in blank.

In addition to signing this contract on the evening of October 27, the Petersons executed title cards covering the 1946 Dodge and the 1955 Ford. The Petersons wanted to make an out-of-town trip so they asked if they could have the car immediately upon payment of the sum of $100. Rukes agreed to this arrangement, the $100 was paid, and Peterson took possession of the car. The Petersons had some money coming from an attorney on some litigation which he had been handling for them, and they agreed to make the balance of the downpayment as soon as they received that money.

On November 4, 1955, defendant sold the conditional sales contract to the Industrial Credit Company. On the same date, defendant paid its salesman a commission for selling the 1955 Ford and credited as earned the salesman's commission for a sale of the 1946 Dodge. On November 7, 1955, defendant mailed a copy of an invoice to the Petersons. On the same date, either defendant or the Industrial Credit Company mailed a copy of the conditional sales contract to the Petersons. The title to the 1955 Ford was transferred to the Petersons on October 31, 1955.

The original deal called for deferred payments of $50 per month. On November 8, 1955, the Petersons brought defendant the remaining $400 of the $500 downpayment. They were then informed that the monthly payments would have to be $70 per month. When they received the invoice and a copy of the conditional sales contract, which had been mailed to them on November 7, they discovered that the monthly payments were $70 but there was a final "balloon" payment of $895. It is their claim that this contract was not in accordance with the agreement they had made. Of the $400 downpayment made on November 8, Mrs. Peterson had issued her check for $315.73, and on or about November 11 she stopped payment of that check when, as she claimed, she learned that substantial changes had been made in the contract. Thereupon defendant took possession of the Ford automobile without making any attempt to reimburse the Petersons for their old car or for the amount which they had paid on the Ford.

Essentially, it is the claim of defendant that it was the intention of the parties that the title to the 1955 Ford should not pass to the Petersons until they had completed the downpayment and that, in view of the fact that payment was stopped on the check constituting part of the downpayment, there never was a sale; consequently that the time never arrived when it was necessary for defendant to furnish the written statement required by the ordinance. Defendant fails to offer any explanation as to why the invoice and copy of the conditional sales contract were mailed to the Petersons on November 7 if, at that time, no sale had been made.

■ Prosecutions for violation of a city ordinance, while in the nature of a criminal proceeding,[1] are governed by the rule of civil cases, in that proof to sustain a conviction need only constitute a fair preponderance of the evidence.[2]

■ While there is no definition of the term "sale" in the ordinance, a sale, as there used, may reasonably be equated to the use of the word in our Uniform Sales Act. M. S. A. 512.01(2) provides:

[1]State v. Ketterer, 248 Minn. 173, 79 N. W. (2d) 136.
[2]State v. Wilson, 244 Minn. 382, 69 N. W. (2d) 905.

"A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price;"

Section 512.18 reads:

"(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.[3]

"(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

Section 512.19 reads in part:

"Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer.

"Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed."

■ Under these statutory rules as applied to the evidence in this case, the question of intent of the parties is one of fact[4] to be determined by the trial court from the evidence which it accepts as true. The trial court found that on the evening of October 27 the minds of the parties had met in agreement upon the terms of the contract.

■ In the absence of a contrary intention, when goods are ready for delivery and the terms of the sale have been agreed upon, it is presumed that the property in the goods passes to the buyer even without payment or delivery.[5]

■ The question then arises: Is the evidence in this case so conclusive that the parties did not intend the property to pass to the purchaser until the entire downpayment had been completed that the court was compelled to make that finding of fact? We think that

[3]See, also, 2 Williston, Sales (Rev. ed.) § 261.
[4]Gardner v. N. P. Ry. Co. 118 Minn. 275, 136 N. W. 1028.
[5]Rail v. Little Falls Lbr. Co. 47 Minn. 422, 50 N. W. 471; 2 Williston, Sales (Rev. ed.) § 448.

the findings of the trial court that there was a sale on October 27 is well sustained by the evidence. As stated by the trial court in its memorandum:

"* * * If, under the circumstances, there had not been a sale, it seems improbable that a commission would have been paid to the salesman who sold the 1955 Ford; that the 1946 Dodge would have been sold and a commission paid on the sale; that title to the 1955 Ford would have been transferred to the Petersons; that the contract would have been sold to the Industrial Credit Company; or that a copy of the contract and the invoice would have been mailed to the Petersons."

There having been a sale on October 27, 1955, it goes without saying that defendant violated the provisions of the ordinance since it is not claimed by anyone that defendant then furnished the buyer with the written statement required by the ordinance on October 27. We find no reversible error.

Affirmed.

FRANK T. GALLAGHER, JUDGE (dissenting).

It is my opinion that under all the facts and circumstances here we can hardly say that a sale was consummated to the extent that the defendant is guilty of a violation of the ordinance.

Here we have a situation where there seems to be considerable disagreement between the parties as to just what the deal was. Defendant claims that it was the intention of the parties that the title to the 1955 Ford should not pass to the purported purchasers until they completed the downpayment and that, in view of the fact that payment was stopped on the check which constituted part of the downpayment, there never was a sale. The purported purchasers on the other hand contend that when they discovered that there was to be a final "balloon" payment of $895, that provision was not in accordance with the agreement they had made with the defendant. In any event, it is undisputed that $315.73 of the downpayment made on November 8, 1955, was never actually received by the defendant inasmuch as payment was stopped on the check for that amount.

Considering the record in its entirety and the apparent conflicts between the parties as to their respective understandings in connection with the entire transaction, I cannot agree with the majority that the so-called sale was completed so as to justify a conviction for the violation of the ordinance involved.