**William David McARTHUR**

v.

**John PENNINGTON, Tom Russell and City of Loudon.**

**Charles Edward McARTHUR**

v.

**John PENNINGTON, Tom Russell and City of Loudon.**

**Nos. 4675, 4676.**

United States District Court
E. D. Tennessee, N. D.

Oct. 22, 1963.

Paul W. Sorrick, Jr., Chattanooga, Tenn., for plaintiffs.

H. H. McCampbell, Jr., Knoxville, Tenn., for defendants.

ROBERT L. TAYLOR, Chief Judge.

These cases arise under the Civil Rights Statute, Title 42, Sections 1983 and 1985, United States Code, and the statutes and common law of the State of Tennessee.

Plaintiffs, William David McArthur and his brother, Charles Edward McArthur, were truck operators owning their own trucks at the time of the matters complained of in these suits. William McArthur is still engaged as a truck operator and lives in Chattanooga, Tennessee, and Charles has, temporarily at least, abandoned that field of endeavor and is engaged in other business and living in Franklin, Williamson County, Tennessee.

The defendants, Messrs. John Pennington and Tom Russell, were police officers of the Town of Loudon, Tennessee at the time of the matters complained of, and insofar as the Court knows are still police officers of that town.

The City of Loudon, the third defendant, is a municipality created by the State Legislature of Tennessee and is located within the limits of Loudon County.

Briefly stated, plaintiffs claim that the two officers, while in the performance of their duties, deprived them of their liberties under the federal statutes, the Tennessee statutes, the City Ordinances of the City of Loudon, and the common law of Tennessee by arresting them and placing them in jail without probable cause; that they held them incommunicado from the time of their arrest around 3:30 a. m., until around 5:30 to 5:40 a. m., refusing to permit them to consult counsel or to notify their relatives and friends of their arrest and condition; that they held them without placing any charges against them until they were taken before the City Recorder's Court; that they committed illegal and unlawful searches and seizures of their vehicles; that they took them before the City Recorder's Court and the Court of General Sessions of Loudon County and there wrongfully pyramided the charges against them, thus hindering, impeding and defeating justice in due course and causing them much expense in the form of attorney fees, court reporter fees, traveling costs, etc.

The City of Loudon contends that it cannot be held as a matter of law for the alleged violation of plaintiffs' rights. This phase of the case may be disposed of in short order. The City is right in this contention. It is not liable under the Civil Rights Statute. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492; Sires v. W. R. Cole et al. (C.A.10, July 17, 1963) 320 F.2d 877.

The City contends further that if the things set forth in the complaint are true that it cannot be held in damages in this case because the alleged wrongful acts complained of were not committed by the officers in the scope of their authority as police officers of the City of Loudon. The City denies that the officers were guilty of any irregularities or other wrongful acts.

The officers contend that they had a legal right to do what was done in arresting the McArthurs because William committed a traffic violation in their presence which gave them authority to arrest and as and when they were undertaking to make the arrest they were met with resistance, or threats of resistance, in

the performance of their duties as police officers; that the charges they made against the McArthurs were justified; that the search they made of the Mc-Arthur trucks was not illegal; that they were not held incommunicado but were allowed to make a telephone call from the jail within forty-five minutes after their arrest; that they did not conspire to do anything wrong.

The issues as set forth in the pre-trial order are as follows:

1. Did the defendants, if so which one, if not all, violate any right of plaintiffs or either of them, if so which one, under Title 42, Sections 1983 or 1985?

2. Did defendants falsely arrest, maliciously prosecute, wrongfully assault or falsely imprison the plaintiffs or either of them and if so which one, or were these individual defendants guilty of a conspiracy to violate plaintiffs' civil rights, Title 42, Section 1985, for which plaintiffs have a right of action? (The City of Loudon is no longer in the suit on the conspiracy charge, the Court having heretofore entered an order of dismissal.)

3. If the plaintiffs are entitled to recover, what is the amount due each?

It was stipulated that the judgments in the City Recorder's Court, General Sessions Court, the Criminal Court and Circuit Court, which have been marked as exhibits in the case, are properly authenticated.

It was further stipulated that the place of the initial contact between the officers and the plaintiffs was within one mile of the corporate limits of the City of Loudon.

This case has given the Court more than ordinary concern. We are dealing with the rights of individual citizens and with the rights and duties of authorized officers of a municipality. The Court recognizes the rights and the duties of a police officer to arrest for violations of the City Ordinances within the limits of the municipality served by the officers, and under a recent act of the legislature within one mile of the city limits. The Court further recognizes the trials and tribulations of a police officer in the performance of his duties. These officers also served during the nighttime which makes the performance of their duties more difficult. They were charged with the responsibility of enforcing the ordinances of the City of Loudon and with the responsibility, along with the county and state officers, of protecting the lives and property of the citizens of the City of Loudon.

We also have to consider the rights of two young men, one of them around thirty years of age and the other thirty-three years of age, engaged in their business of driving large trucks from Chattanooga, Tennessee to New Jersey and New York.

On the early morning of April 12, 1962, these young men passed through the City of Loudon between 3:30 a. m., and 4:15 a. m., each operating his own truck. They passed through the town and negotiated a bridge on the eastern outskirts of the town when William discovered a police car following him. He stopped his truck beside the road and was accosted by the officers. His brother Charles, finding him in custody of two officers, or about to be placed in custody of the officers, stopped his truck a short distance to the rear of William's truck and immediately went to the place where William and the officers were standing and asked the officers, in effect, why they were about to arrest William. This aggravated the trouble, which seems to have started when Mr. Russell asked William for his driver's license and William asked, in substance, why he had been stopped. Mr. Russell did not like the question and soon made it known to William that he did not.

William McArthur testified that Mr. Russell struck him with his police weapon, and Mr. Russell stated, in substance, that William struck him; that he took hold of his arm; that he gave him an unusual amount of trouble, and while this trouble was going on, Mr. Pennington, as contended by him, had his book in his hands for the purpose of citing William to ap-

pear before the Recorder's Court for a traffic violation, but observing Mr. Russell having some difficulty with William alighted from the car and also took hold of William's arm. About that time Charles came upon the scene and, according to the policemen, stated, in substance, to them that they could not do that to his brother.

This apparently disconcerted, if not enraged, the policeman, and in the course of the arrest, or attempted arrest, Mr. Pennington pulled his gun, according to the McArthur boys, and placed it in the stomach or toward the stomach of Charles and stated to him in effect that if he didn't turn loose of Mr. Russell that he would shoot his stomach out.

Finally, according to Mr. Russell, William stated, in substance, that he would surrender or that he had surrendered and requested permission to park his truck away from the road. The same request was made by Charles. The requests were granted and the McArthur boys parked their trucks off the highway, locked them up and put the keys in their pockets.

The plaintiffs were taken to the jail in Loudon, were searched and relieved of personal effects including the keys to their trucks, and were placed in jail and held for some time before being permitted to make a telephone call.

The parties are not in agreement as to how long they were held before they were allowed to make this call. The policemen claim that it was only forty-five minutes, while the plaintiffs claim it was around an hour and a half, or possibly longer.

The explanation given by Mr. Russell for putting them in jail without allowing them to make bond is that one of them had gotten "rosy" again—meaning he had shown a belligerent attitude.

The explanations given by Mr. Pennington for not allowing bond are that he did not know what the amount of the bond would be, that a judicial officer was not at the time available and that the cash which they had on their persons was probably not sufficient for the amount of the cash bond. The proof shows that one of the boys had about a hundred dollars on his person and the other in excess of a hundred dollars.

After they were put in jail, Mr. Pennington drove, along with the jailer, Lane, to the place where the trucks were parked, and using the keys which had been seized, proceeded to search the tractor, or the seats of each tractor, or to cause such searches to be made.

Officer Lane was with Mr. Pennington and assisted him in making the searches, and he said that he found a bottle of pills which he described as legend pills in the seat of one of the trucks and also a hunting knife in a scabbard.

■ The Court need not spend much time on these illegal searches as counsel for the defendants concede that the constitutional rights of the McArthurs were violated by the officers when the searches were made.

In that connection, counsel for the City presented a brief to the Court after the proof had been in which it cited the case of Duncan v. State, 191 Tenn. 427, 234 S.W.2d 835, to support the acts of the officers. With proper deference to counsel, the facts in this case may be differentiated from the facts in the instant case. The person arrested and searched in the *Duncan* case was known as a dangerous character and a common thief. These McArthur boys are shown in this record as persons of good reputation. They are not common criminals, or felons. They are law abiding citizens.

Another case cited is that of Atkins v. Harris, 202 Tenn. 489, 304 S.W.2d 650. In that case, Harris' automobile was searched about eighteen feet from Harris' house after the officers had confiscated illegal whiskey from Harris. The theory of the search in that case was an effort on the part of officers to obtain the fruits of the crime which under ordinary circumstances justify the search. Also, a search ordinarily can be made incident to an arrest in order to prevent the one arrested from fleeing from the

officers. Such a search permits searches for dangerous weapons and other articles of personal property.

The searches here were not made to prevent the McArthur boys from escaping because they were in jail and their trucks were at least in the constructive possession of the city officers since they had the keys to them.

At this point, the Court will proceed to summarize the testimony of each witness in order that the parties and counsel may know the basis for the conclusions the Court may reach.

William David McArthur drives and leases his truck. The only blemish against his record was a conviction on a traffic violation. As previously indicated, on April 12, 1962, Charles drove his truck through Loudon on his way to New Jersey and his brother William was following behind him on his way to New York. Charles stopped on the west side of a red light in Loudon and William pulled up behind him and Charles waved him on by. After William crossed the bridge on the eastern side of the city, around 3:30 a. m., Mr. Russell, the policeman, pulled up beside his tractor and William pulled off of the road and stopped. One of the officers asked him for his driver's license and he got out his pocketbook and was looking for his driver's license. The officer asked him why he passed the truck. Russell hit him on the neck and Pennington jumped over and told him to get into the car. His brother asked what was happening, and Pennington hit his brother with a slapjack. Pennington stuck a pistol in his stomach. Pennington said, "Turn him loose or I will shoot him." The policemen took them to jail and Officer Lane was in front of the jail. Charles asked Pennington to make a phone call, and Pennington told him if he opened his—using an ugly word—mouth, he would do him bodily harm. He asked Lane to make one phone call and Russell said, "You will make a phone call when we let you. We want you to know how the law operates in this area." He was allowed to make a telephone call about 5:30 a. m. No charge

had been placed against them. He asked Lane why he couldn't make bond, and Lane replied that he couldn't make bond because they didn't know what he was going to be charged with. Pennington asked him about his health. William told him that he did not take pills, but testified Pennington claimed there was found in his truck a bottle of Bennie pills. William told him that if pills were found in his truck they were not his pills. He told the police officer if the pills were found in his truck he did not know about such pills. He was kept in jail until 9:00 a. m. Attorney Ridenour came to the jail and got them out of jail, and as the Court recalls that was around seven a. m., rather than nine a. m.

The officer told William that he was charged with possession of legend drugs and other things, and he was taken before the City Recorder's Court where he was charged with illegally passing a moving vehicle, assault and battery, resisting arrest, possession of legend drugs.

The City Recorder's Court found him guilty of a traffic violation and fixed his bond in the sum of $218.00. An appeal was taken from the Recorder's Court judgment. Upon the motion of the City, the case of reckless driving was dismissed. The General Sessions Court dismissed the deadly weapon charge. William was charged with assault with intent to commit a felony and bound over to the Grand Jury. The Grand Jury returned a true bill on the assault and battery but the jury acquitted him. The charge of possessing legend drugs was dismissed when the Court directed the jury to return a verdict of not guilty.

The out-of-pocket expenses incurred jointly by William and his brother, Charles, were approximately $3,602.98, which included attorney fees, court report costs, premiums on bonds, and a small amount of traveling expense incurred in preparation for trial.

In addition to the out-of-pocket expenses, William lost $1,600.00 of wages due to the fact that he had to attend court in Loudon County some four or five times

and lost four trips from Chattanooga to New York which was equivalent to the loss of one week's work on each occasion.

On cross-examination, William testified that he passed his brother on the right side of the street about one hundred feet from where the streets intersect on the side toward Chattanooga; that he pulled up behind his brother and stopped and his brother motioned him on around; that he saw a truck meeting him which was traveling in the direction of Chattanooga. This was the Powell truck, or a truck that was owned by Powell and being driven by Mr. Cline. He saw the police sitting in a car near the fountain headed toward the courthouse and William drove on. It was about 3:30 a. m. He saw the red dome light on the police car flickering, he pulled off beside the road and parked and Officer Russell got out and asked him for his driver's license and he got out his billfold to get it out but did not get it out. He was told that he passed a moving vehicle at an intersection. He did not have his arm around Russell's neck; his brother did not say, "You can't do that because that's my brother;" doesn't know whether Russell's face was bruised but Russell's face hit the mirror on the truck when they were scuffling; he did not say to another officer at the jail if he had been there he would have beat him up; when Officer Pennington hit his brother there was a fracas. He was holding Officer Russell to keep him from hitting his brother. Officer Pennington drew the gun on his brother and put the gun in his brother's stomach and said, "I will blow your guts out." He was hit twice on the neck. Pennington and Russell both hit him. His brother came up to the scene after he was stopped by the policemen and asked what was going on, and told them that this was his brother. Pennington hit his brother. The Recorder's Court told him that he was charged with reckless driving and running a truck off the road. He saw Mr. Russell bleeding at the mouth in the police office. Russell pointed to his face and said to him, "You did this." Lenoir

City Policeman Flynn told them to tell these fellows, "You are going to be here awhile," meaning in the jail. Flynn told them if he had been out there he would have put a bullet through their heads.

Charles Edward McArthur, now living in Franklin, Tennessee, corroborated his brother's testimony about the expenses incurred in the cases. He stated that a traffic light caught him in Loudon as Bill came off the hill, and the light changed and as Bill pulled up he signaled Bill to go on. A police car followed him across the bridge and passed him and pulled beside Bill's truck. As he walked up he saw them hitting Bill, and Pennington hit him on the back of the head and told him, "If you make a move I will blow your brains out." After the argument they were permitted to move their trucks and to lock them. Russell said if he opened his mouth he would blow his brains out when he asked to make a phone call. The officer did not tell him with what he was charged. When he asked what the trouble was, Pennington told him it was none of his business. He was later charged with interfering with a police officer and filed an appeal of his case. The case was finally dismissed. He was charged with assault and his case was likewise dismissed. He had a knife in his tool box under the seat of his truck and this was the dangerous weapon he was charged with possessing. He was struck by Pennington across the ear and neck with a slapjack. He had a knot on the back of the ear, and many people asked him about the incident. He saw Russell hitting Bill with a billystick.

William Cline was a passenger of what has been described in the record as the Powell truck which met William McArthur at or near the street intersection in Loudon. Cline, as previously indicated, was going toward Chattanooga or in the opposite direction the McArthur boys were traveling. Cline testified by deposition that after the first truck had stopped at the light at the street intersection, he moved on and that he was not interfered with in passing through the intersection by the McArthurs. He stat-

ed that he did not see the McArthur boys do anything inconsistent with safe driving practices.

Charles Paul Cline was the driver of the so-called Powell truck. His deposition corroborates the testimony of William Cline in the statement that their truck did not pass through the intersection at the same time that the McArthur truck passed through it. The effect of his testimony is that the McArthur truck did not interfere with the Cline truck in passing through the intersection nor was the driver of the McArthur truck doing anything inconsistent with safe driving practices.

John Pennington, sixty-three years old, is now chief deputy, Loudon County. His testimony is that he either arrested or assisted in the arrest of William David McArthur; that the McArthur trucks came into Loudon around 4:10 a. m.; that William McArthur's truck tried to pass another truck at an intersection. He stopped William McArthur's truck at the east end of the bridge east of the city, and Russell got out to arrest or cite William McArthur for a traffic violation, and Pennington had his citation book in his hand while sitting in the car awaiting the report of Russell as to the name of the person who violated the traffic law and other pertinent data. When Pennington observed Russell and the other man scuffling he got out of the car to see what was going on. About that time Charles came up and interfered, presumably with Russell arresting William. He then hit Charles with a slapjack and by that time they were all fighting and he called for help. William was about to get Russell down and he told him if he did not turn him loose he would shoot him. They arrested the McArthurs and told them that the charge was passing at the intersection. The eyes of the McArthur boys were wild and glassy looking. The McArthur boys were arrested and taken to jail. Russell was cut in the eye, his mouth was bleeding. They were having too much trouble with the boys to search their trucks at the time of the arrest. When the McArthur boys asked to make a phone call, Russell told them they could make a phone call when they cooled down. The McArthur boys did not offer to use any weapons. William McArthur had Russell around the neck with his left arm and hitting him with his right.

When the cab of the tractor on Charles McArthur's truck was searched, Lane said in substance here is a hunting knife eight inches long or longer in a scabbard. Lane looked into William McArthur's truck and said that he found the bottle of pills with some of the pills gone.

They allowed them to use the phone about 5:30 a. m. They did not have a search warrant authorizing a search. He told the McArthur boys that Charles was charged with interfering with officers, and William was charged with passing a truck at an intersection and driving recklessly. They were later charged before General Sessions Court with possession of drugs and dangerous weapons and assault. One of the McArthur boys had a hundred dollars on his person and the other had about $125.00.

Mr. Flynn is a Washington, D. C., policeman. He was an officer in Lenoir City at the time the McArthur boys were arrested. He was called by the Loudon County officers to assist them. He was six miles away. He testified that one of the McArthur boys stated to him that if Pennington or Russell hadn't got out their blackjack that they would have beaten hell out of them. The McArthur boys also told him that if he had been there they would have beaten hell out of him. The McArthurs were loud and boisterous.

Mr. Lane is a city policeman of Loudon. He was also deputy sheriff of Loudon County in 1962 and was the jailer at Loudon County at the time plaintiffs were arrested. He was called by Russell and Pennington and advised that they needed help across the bridge. He testified that Russell had a bruised place on his face. Pennington said, "Let's go back over and search the trucks." He wanted to see what was in the trucks that was making them so mean. He found a bottle of pills in one truck and a stick and a hunting knife in a little case in the other one.

The boys acted about half drunk but he could not smell anything on their breath. Russell told them that as soon as they quietened down they could use the phone. The charges were placed against them as soon as they were brought into the jail. They were kept in jail about forty-five minutes before making a telephone call.

Tom Russell, fifty-nine years old, stated that he saw one truck pass another under the street intersection light while a third truck was coming in the opposite direction. When they stopped the truck, he asked William McArthur for his driver's license and William started to get it out and while engaged in that process asked Russell why he was required to do that, and also stated about that time that he wanted "to ask one damn question." Russell at that time had hold of his arm and his brother came and said, "This is my brother," and he started to pull away and Pennington got out of the car and took the other arm. He said he did not strike William with a stick, although Charles had testified he had hit his brother without cause, and Charles said you hit my brother without cause, and he was knocked back against the car. Russell stated that he was hit in the face and both men held him around the neck. Charles told William to turn loose as Pennington was going to shoot. Russell stated that his hand still bothers him from injuries received in the fight. William finally turned loose and said he would surrender and the policemen let them move their trucks away from the main highway. The McArthurs were told that they were being charged with reckless driving, resisting arrest. At that time, Charles began to get "rosy" again, he was unruly, and he told him when he quietened down he could use the phone. Attorney Ridenour came to the jail around 7:00 a. m. The parties met in City Hall around 8:30 a. m. Russell stated that one truck was moving at about five miles an hour, presumably meaning Charles McArthur's truck, and the passing truck, presumably meaning William's truck, was going between 25 and 30 miles an hour. Russell stated that it was unreasonable for William McArthur to ask someone else a question about the offense and that William hollered for Charles about the time he heard Charles get out of his truck. Plaintiff did not ask to make bond. Charles got "rosy" and looked like he was drunk. That was after Charles had been hit. Charles was locked up because he did not have enough money to make bond. He was charged with assaulting an officer and interfering with an officer. Russell did not have anything to do with the charges about the pills or the weapons charge. Russell stated that William tried to get away from him.

This concludes the summary of what the Court considers the pertinent evidence of each witness who has testified in the case. Mrs. William McArthur appeared in Loudon sometime after the arrest of her husband and saw bruises on his body which were described in his testimony. Mrs. Woody testified in the case but the Court does not consider her testimony pertinent to any of the issues involved in the case.

There are so many conflicts in the testimony of the witnesses it is difficult for the Court to find the facts. The Court must be careful not to find any fact that is not supported by a preponderance of the testimony. The testimony of the two policemen conflicts with the testimony of the two McArthur boys as to the cause of the arrest. The policemen stated unequivocally that William McArthur's truck passed Charles McArthur's truck and in doing so continued on through the intersection of the streets near the public square of Loudon at which electric traffic lights are located, that while passing through this intersection William met another truck, which has been described as the Powell truck, proceeding in the opposite direction.

If the police officers are correct in their theory of the arrest, they had a legal right to arrest William because they observed his violating both the city and state law. In Tennessee, by statute, an officer may arrest a citizen without a

warrant for a misdemeanor if the offense is committed in his presence. The charge for which the officers say they arrested William was a misdemeanor. The alleged interference by Charles McArthur with the officers while they were making an arrest, was likewise a misdemeanor under the Tennessee law if he interfered with the arrest.

The testimony of the McArthur boys with respect to the violation was diametrically opposed to that of the police officers. Charles McArthur said he had pulled off at a point in the street west of the traffic light at the intersecting streets and stopped; and while he was stopped William drove his truck up by his side and he motioned him to go on by and William passed by and through the intersection while the light at the intersection was green and while the intersection was free from other traffic. William says the same thing, in effect.

The police officers have established good reputations through the testimony of responsible citizens. Every witness who takes the witness stand is presumed to tell the truth. The McArthur boys likewise have established good reputations in this record by responsible people. They are interested witnesses because, among other things, they are suing these officers and the City for large sums in damages. These police officers are just as interested in the outcome of the lawsuit as are the McArthur boys because if there is liability they would be held for damages. From a quantitative standpoint at least, the testimony of the McArthurs and the officers offset each other. The burden of proof is upon the McArthurs. They must carry the burden by a preponderance of the evidence. This leads us to an examination of the Cline testimony.

The Cline people are disinterested witnesses. So far as this record shows they did not know the McArthur boys prior to this accident. Counsel for the defense asked one of the McArthurs if he belonged to the teamsters union. The only bearing that question could have had is whether or not these union members stick together so tight that they might show a partisan attitude in their testimony. The McArthur boys do not belong to the teamsters union, nor do the Cline boys so far as this record shows. If the Cline boys were telling the truth, William McArthur did not violate the law which was the cause of his arrest.

But this leads us to another difficult point in the lawsuit and that is why two police officers of the City of Loudon would arrest these McArthur boys on a trumped up charge if they did not know them.

Ordinarily when an officer arrests a citizen wrongfully a motive for the action of the officer will eventually emerge. The motive may be fear, envy, hate, malice, or kindred things. Neither malice nor envy or ill-will, or anything of that kind existed at the time between these officers and the McArthur boys.

The preponderance of the proof in this case is to the effect that William McArthur did not violate the city ordinance of Loudon immediately before he was arrested and that he was not guilty of reckless driving immediately before his arrest, but the Court hesitates to find as a fact that these officers arrested William without cause when they say that they saw him run a street intersection when another truck was in the intersection at the same time and thus violate a city ordinance of Loudon. But this does not end the story.

The Court is of the opinion that the methods used by these officers cannot be legally justified even if it be assumed, and the Court will assume, that they were acting in a conscientious manner in arresting William McArthur and his brother Charles. In the opinion of the Court, and the Court finds, they were treated wrongfully because more force was used by the officers than was necessary to make the arrest; that they were placed in jail without being given a reasonable chance to make bond; that at the time the arrest was sought only one of them was charged and he with a misdemeanor, namely, that of violating a traffic ordinance of the City of Loudon.

Despite this; there is evidence in the record that indicates that they were treated more like felons than misdemeanants. William felt that he was treated so badly by the officers that while on the witness stand he spontaneously exclaimed in substance that he wondered if the law treated citizens that way.

The McArthurs were wrongfully treated, in the opinion of Court, and the Court finds that the officers placed them in jail without giving them an opportunity to phone their lawyer or their friends; that one or both of the McArthurs were struck by one or both of the officers. The officers claim that they were justified in striking them because they were resisting arrest, but a preponderance of the proof shows that the force used by the officers in making the arrest was excessive.

To what extent, if any, these boys resisted arrest is most difficult to determine in this case. The Court is of the view and finds that Charles McArthur was within his rights when he appeared upon the scene where his brother was located and asked, in substance, what was going on and told the officers that they were dealing with his brother. Charles' action was prompted by a natural impulse of one brother toward another. The officers construed his actions as an interference with them in the performance of their duty.

The Court is of the opinion and finds that the force the officers used in dealing with the McArthurs was greater than that required to put them under arrest if anything that was done by either of them justified an arrest.

The Court finds that the officers violated the rights of the McArthur boys under Section 1983, Title 42, United States Code, but the City is not responsible for damages for such violation.

The Court further finds that the officers committed wrongful acts against these boys under the common law and statutes of Tennessee in that they used more force against them than was necessary to make the arrest, that they placed them in jail without giving them an opportunity to communicate with their lawyer and their friends, that they were held in jail from between 3:30 and 4:15 a. m., until their appearance before the City Recorder's Court in Loudon around 8:30 a. m. and that the multiple charges placed against them under the circumstances shown in this record amounted to official oppression, all of which was done by them in the performance of their functions as city policemen.

The Court further holds that the wrongful treatment of these men was compounded by the officers when they took from them the keys to the cabs of their trucks and without a search warrant, or without any legal justification, carried on an exploratory search of the cabs of their trucks and thereafter attempted to prosecute them for the alleged pills and alleged deadly weapons that were found in the trucks.

These McArthur boys were required to spend large sums of money as expenses to defend themselves against charges on all of which the Courts of Loudon County and the City of Loudon cleared them.

The Court has held that the officers were acting as agents and representatives of the City of Loudon in the commission of what the Court has held wrongful acts against these plaintiffs and if the City were an individual or corporation, or a partnership, it would be liable in damages for such actions. However, the City is immune from liability for wrongful actions of its policemen committed while in the performance of their duties unless the City has waived immunity for such actions by the carrying of liability insurance.

The answer of the City in this case states in pertinent part: "It (defendant) admits that its co-defendants Pennington and Russell are employed by it as police officers. It denies that the acts of its co-defendants and police officers alleged in the complaint are imputable to it. It admits that it maintains a municipal liability insurance policy with the insurance company of America, but it denies that by so doing it has waived its governmental immunity from lawsuits of

the type set forth in said complaint and thereby gave consent that it might be sued pursuant to such a cause of action."

█ The insurance policy was not introduced in evidence. The Court has not had an opportunity to examine it. The Court holds that the City is liable to the extent of the coverage of this insurance policy but not in excess of the face amount of the policy for the wrongful acts found by the Court to have been committed by the police officers.

This brings us to the final question in the case, the amount of damages.

William McArthur is suing for $100,000.00 damages. His brother, Charles McArthur, is suing for $80,000.00. Their counsel was asked why William McArthur was suing for larger damages than Charles, and he replied that William McArthur was wrongfully charged by the officers with possessing legend drugs, or in the common vernacular, "Bennies". True, it is an ugly charge against a motor vehicle driver and one that is serious if established, that is, it is a violation of law for a truck driver to drive a truck on the public highways under the influence of "Bennie" pills.

█ The out-of-pocket joint expenses of the two boys are substantially as follows: $356.49, $250.00, $600.00, $2,286.49, aggregating the sum of $3,492.98 for attorney fees, to which should be added $20.00 court reporter, $10.00 for some other item of damage which the Court remembers as premium for bond, $80.00 for traveling expense in preparation for the trials, making a grand total of $3,602.98. This divided by two shows that each plaintiff has suffered out-of-pocket expenses of $1,801.49. Each lost four trips with his truck from Chattanooga to destinations in the east. This, according to their undisputed testimony, meant that they lost the entire week when they could not make the trip on the date they were called to run and that each lost four weeks work because of five days that they were required to go to court in Loudon County. They stated that they lost $400.00 on each of these weeks. This would amount

to $1,600.00 loss of wages. The $1,600.00 added to the $1,801.49 makes a total expense to each of these plaintiffs of $3,401.49. In addition to this amount they are entitled to reasonable damages for physical and mental suffering and humiliation and injury to reputation. The Court fixes the total damage of each plaintiff at $5,100.00.

In preparing these findings, the Court has relied on 68 A.L.R.2d, p. 1438 et seq., particularly 1459. Also on the question of illegal arrest, 4 Am.Jur., under subject of arrest, Sec. 92, p. 63; excessive force in arrest, 4 Am.Jur. Sec. 51, p. 183 under the subject of assault and battery.

With respect to general principles dealing with liability of the City for acts of its officers when it has waived its immunity from suit by carrying an insurance policy, see Nishan v. Godsey, and City of Loudon, E.D.Tenn. (N.D.), Sept. 30, 1958, 166 F.Supp. 6. As to the amount of force that may be used by an officer in making an arrest for misdemeanor and a felony see Human v. Goodman, 159 Tenn. 241, 18 S.W.2d 381, et seq.; Brown v. State, 159 Tenn. 422, 19 S.W.2d 231. In that case, Judge Swiggart, speaking for the Court, at page 426, 19 S.W.2d at page 232, said in part:

"There was no emergency requiring the arrest of Andrew Hammock on the night of the homicide. The disturbance had ceased and he was on his way home. There was no likelihood of his flight, and a warrant could have been served upon him after his passions had cooled with little possibility of trouble. It was certainly unlawful for Brown to employ his pistol in making the arrest for a simple misdemeanor. This court has recently spoken on this subject in no uncertain terms. Human v. Goodman, 159 Tenn. [241], 18 S.W.(2d) 381. The blows struck by Brown with the pistol were unjustifiable, and he thereby placed himself in the wrong. His own evidence justified an inference by the jury and trial judge that Andrew and Jeff Hammock were only trying to disarm him, and prevent his further assaults with the pistol. We

are of that opinion, and think they were thoroughly justified in so doing, not-withstanding the previous misconduct of Andrew Hammock at the church."

State ex rel. Parker v. Dunn, 39 Tenn. App. 190, 282 S.W.2d 203. On the general question of searches without warrant, see, Elliott et ux. v. State, 173 Tenn. 203, 116 S.W.2d 1009.

The Court does not deem it necessary to take up further space by citing cases to support its conclusion that the searches of the trucks in the present cases were unlawful, as this question was not seriously contested.

It may be proper briefly to mention the attorney fees that were charged to these plaintiffs. Counsel for the defendants have indicated that they may be on the high side. This is a question that is not necessary for the Court to decide. It may be pointed out that these plaintiffs were required to pay these fees or have obligated themselves to pay them and they are therefore items of damage.

Let an order be submitted in conformity with the views expressed herein.