## STATE v. SAM BRUNO.

196 N. W. 2d 459.

April 7, 1972—No. 42395.

---

*C. Paul Jones,* State Public Defender, and *Jerome D. Truhn,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *John M. Mason,* Solicitor General, and *Robert F. Carolan,* Special Assistant Attorney General, for respondent.

Heard before Knutson, C. J., and Rogosheske, Todd, and Mason, JJ.

TODD, JUSTICE.

Defendant, Sam Bruno, appeals from his conviction of five counts of aggravated robbery. He claims that there was not probable cause for his arrest, that evidence seized from him at the time of his alleged illegal arrest could not be used against him, and that evidence obtained from the arrest of his alleged accomplice could not be used against defendant unless properly obtained by the authorities who arrested his alleged accomplice. In opposition, the state contends that defendant's arrest was based on probable cause, that the accomplice's arrest was also legal, and that defendant has no standing to contest the constitutionality of the search of his alleged accomplice which resulted

in the seizure of evidence ultimately used against defendant. Examination of the record shows that it contains adequate evidence on the issue of probable cause for arrest, and we adhere to our previous holdings that a defendant lacks standing to challenge the search of another person wherein evidence incriminating to the defendant is uncovered.

On May 18, 1968, between 9 and 10 p. m., the Tiegen Shopping Center, a general merchandise store at Oslo, Minnesota, in Dodge County, was robbed by two men armed with revolvers. The victims described the taller of the robbers as wearing a ski mask, a checkered, dark, rain-and-shine coat, a light blue shirt, and black shoes and dark trousers, and as being approximately 5 feet 10 or 11 inches tall and weighing approximately 175 to 180 pounds. The smaller of the robbers was described as wearing a short gray jacket, a red ski mask, and tinted sunglasses under the ski mask, and as being approximately 5 feet 8 inches tall and weighing approximately 160 pounds.

The robbers took approximately $400 from the cash register and various amounts from persons then in the store. They tied the victims up with leather shoestrings, pulled the telephone off the wall, and left. Thereafter, the victims escaped from their bonds and drove to a house 2½ miles away where they telephoned the Dodge County sheriff's office. On their way to and from the house they observed a white 1968 Chevrolet Impala with a black top, parked approximately one block from the store near the Vernon town hall. The car did not have its lights on, nor could it be ascertained whether it was occupied.

The phone call was received by the sheriff's wife. She immediately contacted a deputy, Gerald Munns, who lived at Kasson, Minnesota. Munns informed the sheriff, Willis Fryer, of the call and then proceeded directly to the scene of the crime. As Munns approached the intersection of County Road No. 13 and Trunk Highway No. 30, which is near the Tiegen store, he observed a late-model white car with a black top crossing the intersection. When he arrived at the store, the victims told him that a similar

automobile had been parked near the Vernon town hall. Munns then radioed Fryer, who was on his way to the store, to investigate the car.

As Fryer and another deputy, Wilfred Meitzner, approached the village of Oslo, they observed a car which fit the description they had been given approaching from the opposite direction. They turned around, followed, and caught up with the car, which was traveling at a moderate rate of speed. As the sheriff's auto approached the suspected vehicle, it turned into a farm driveway and stopped. The driver alighted and approached the sheriff's car, indicating that he was looking for one Earl Johnson and was lost, asking for directions to Highway No. 52. Earl Johnson lives in Kasson, Minnesota, and runs a filling station near the Tiegen store.

The sheriff informed the driver that a robbery had taken place at the Tiegen store and asked him if he would return there. The driver indicated he would be glad to, whereupon Deputy Meitzner got into the Chevrolet vehicle with him and they returned to the store. When they arrived at the Tiegen store, the driver was asked by Deputy Munns for identification and produced a driver's license showing his name to be Gordon Earl Watts, Jr. Watts then inquired as to what the trouble had been at the store and, in an effort to indicate that he had had nothing to do with the robbery, offered to let Deputy Munns search his car. Munns did so and found nothing of obvious evidentiary interest, although in the search he opened the glove compartment and observed some papers therein. He did not remove them or look at them at that time.

In appearance Watts fit the description of the taller of the robbers since he was approximately the same size and was wearing clothes similar to those heretofore described. His shoes were muddy, and his trouser bottoms were wet and torn. It does not appear that at this time any of the robbery victims identified Watts as possibly being one of the robbers.

Deputy Munns told Watts he was going to be held "until they

could further check him out," whereupon Deputy Meitzner transported Watts to Rochester where he was booked and incarcerated. Nothing in the record indicates that at any time up to this point Watts had been advised of his constitutional rights.

While Watts was being transferred to Rochester, Sheriff Fryer searched the car again and examined the papers in the glove compartment. They indicated that the car had been leased to defendant by a Minneapolis car rental agent. When Deputy Meitzner returned from Rochester, he informed Deputy Munns that Watts had indicated that he had been looking for his friend, Sam Bruno, in the vicinity. Deputy Munns recognized the name Sam Bruno as belonging to a person who had allegedly burglarized this same store in 1958 or 1959. Munns thereafter traveled to Rochester for the purpose of reviewing property taken from Watts. When he arrived, he learned that a search of Watts' person had produced, among other things, a speeding ticket issued to Sam Bruno by the Minnesota Highway Patrol at approximately 7:30 p. m. on May 18, 1968, at a location between Minneapolis and Rochester.

At this point aid was sought from the Minnesota Bureau of Criminal Apprehension (BCA). Merton Larson, an investigator for the BCA, received a phone call from his supervisor advising him of the robbery and of the facts that Gordon Watts was in custody and that defendant was also suspected of having participated in the robbery. Larson went to his office and obtained criminal histories of Watts and Bruno. He examined them and then proceeded to Rochester where he met Deputy Munns, who related to him the details of the robbery and advised him of the rental agreement, the traffic citation, and Munns' recollection regarding Bruno's association with a prior robbery of the same store. Larson then attempted to interview Watts, advising him first of his constitutional rights. Watts refused to give a statement.

Munns and Larson then proceeded from Rochester to the Tiegen store where they began an investigation of the area. About an hour after arriving in Oslo, they noticed defendant walking

down the road with a small dog about a quarter of a mile from the store. At first they paid no attention to him, but then decided to investigate and drove up to him, stopped, and honked the horn at him. Defendant turned around and approached their vehicle, meeting Larson who had gotten out of the car. In response to Larson's inquiry, defendant then identified himself as Sam Bruno. At that point, Larson placed him under arrest for armed robbery and began to search him, taking a quantity of paper money from his left front trouser pocket, a large quantity of change from his right trouser pocket, his wallet, and other personal effects.

At the time of the arrest defendant was wearing a thigh-length, sheepskin-lined overcoat. He fit the general physical description of the smaller of the robbers, being about 5 feet 6 inches and weighing about 155 to 165 pounds. The sheepskin coat was obviously different than either of those worn by the robbers, and, except for the similarity in size and the fact that he wore dark glasses, there were no identifying characteristics about defendant to link him to the smaller robber since none of the witnesses was able to describe the smaller of the two with any particularity.

Defendant was taken to the Olmsted County jail in Rochester and his personal property was accounted for in his presence. The paper currency found in his trouser pocket amounted to $411, the coins in his right trouser pocket totaled $21.24, and his billfold contained $22. Among the bills found in the defendant's left front trouser pocket were five one-dollar silver certificates, four of which were later identified by Glen Tiegen, the owner of the robbed store, as having been taken from his cash register. The four bills had been paper-clipped together and had become damaged when they were jammed in the cash register drawer.

Two revolvers, two ski masks, and three cartons of cigarettes were found in an attache case which was discovered together with a gray jacket in the hollow of a tree near the scene of the crime. The dog that had been with defendant at the time of his

arrest was owned by Gilmer Benson, who lived on a nearby farm. Mr. Benson testified that the sheepskin jacket worn by the defendant at the time of arrest belonged to Benson's father and that Benson had discovered in his barn a dark, wet raincoat which he had never seen before and which was similar to that worn by the larger of the two robbers. Matches and cigarette butts of the same brand smoked by defendant were found on the floor of the barn.

Defendant claims that at the time of the robbery he was in Rochester looking for a poker game, and he called two witnesses who verified his alleged defense. Other than the fact he was looking for a poker game, defendant offered no reasonable explanation for his possession of money in an amount similar to that taken from the Tiegen store and, in particular, which included the peculiarly identified silver certificates.

1. What constitutes probable cause for arrest is a fact question peculiar to the situation in each case. The relevant criteria for establishing probable cause to arrest were outlined by this court in State v. Sorenson, 270 Minn. 186, 196, 134 N. W. 2d 115, 122 (1965):

"Probable cause for an arrest has been defined to be a 'reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty.' * * *

"Each case, however, must be decided on its own facts and circumstances and is not subject to some set formula as a guide by which to judge the reasonableness of the arrest in issue. The question to be answered is whether an officer in the particular circumstances, conditioned by his observations and information, and guided by the whole of his police experience, reasonably could have believed that a crime had been committed by the person to be arrested."

The basis for testing the actions of the arresting officer as to the issue of probable cause must be one of reasonableness and

cannot be overtechnical, especially when viewed from the lofty height of hindsight.

In State v. Clifford, 273 Minn. 249, 252, 141 N. W. 2d 124, 126 (1966), this court stated:

"The line between what is mere suspicion and what constitutes probable cause has been characterized as a troublesome one which must be approached in a practical, nontechnical manner. What is reasonable must necessarily depend upon the facts of each case."

In State v. Harris, 265 Minn. 260, 264, 121 N. W. 2d 327, 331 (1963), this court emphasized the requirement of reasonableness, saying:

"To require a high degree of technical competency on the part of the average police officer, i.e., that expected of the prosecutor, would be an unfair and unreasonable standard."

In Hill v. California, 401 U. S. 797, 804, 91 S. Ct. 1106, 1110, 28 L. ed. 2d 484, 490 (1971), the United States Supreme Court reiterated this concept by stating:

"* * * But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment."

Applying these tests to the case at bar, we find that the arresting officers had acquired substantial evidence and information that one Sam Bruno was probably involved in the robbery being investigated or at least was associated with a suspect under arrest for the robbery.

Assuming that, insofar as this defendant is concerned, the evidence was properly in the possession of the arresting officers, we must examine their conduct at the time of the arrest. When investigator Larson approached defendant on the morning following the robbery and defendant identified himself as Sam Bruno, this was all the probable cause that Larson needed to make the arrest. The arrest was not based on any physical characteristics of defendant, any actions of his, the fact that he was

near the scene of the crime, or any of the other varied circumstances which defendant cites in his brief as not being a basis for probable cause for arrest. The investigating officers had probable grounds to suspect Sam Bruno as the possible participant in the robbery. Defendant by his own act of identifying himself as Sam Bruno created the probable cause for his arrest. Such a situation does not violate any of defendant's constitutional rights. All of his constitutional rights were adequately protected from the time of his arrest to the time of trial.

2. Since, in the opinion of this court, the original arrest of defendant was based on probable cause, all evidence obtained from him at the time of that arrest was admissible at his trial. This principle was enunciated in Preston v. United States, 376 U. S. 364, 367, 84 S. Ct. 881, 883, 11 L. ed. 2d 777, 780 (1964):

"* * * Unquestionably, when a person is lawfully arrested, the police have the right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of or implements used to commit the crime. * * * This right to search and seize without a search warrant extends to things under the accused's immediate control."

3. There remains for consideration the right of defendant to object to the use of evidence obtained from the alleged accomplice, Gordon Watts, on the grounds of an alleged violation of Watts' constitutional rights. The United States Supreme Court has repeatedly held that in order to have standing to challenge the constitutionality of a search and seizure, a party must himself have been the victim of the illegal search. Alderman v. United States, 394 U. S. 165, 89 S. Ct. 961, 22 L. ed. 2d 176 (1969); Jones v. United States, 362 U. S. 257, 80 S. Ct. 725, 4 L. ed. 2d 697 (1960). In Jones the court defined an "aggrieved party" (362 U. S. 261, 80 S. Ct. 731, 4 L. ed. 2d 702):

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distin-

guished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else."

In Alderman, the United States Supreme Court further discussed the personal nature of Fourth Amendment rights (394 U. S. 174, 89 S. Ct. 966, 22 L. ed. 2d 187):

"We adhere to these cases and to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. Simmons v. United States, 390 U. S. 377 [88 S. Ct. 967, 19 L. ed. 2d 1247] (1968); Jones v. United States, 362 U. S. 257 [80 S. Ct. 725, 4 L. ed. 2d 697] (1960). Cf. Tileston v. Ullman, 318 U. S. 44, 46 [63 S. Ct. 493, 494, 87 L. ed. 603, 604] (1943). None of the special circumstances which prompted NAACP v. Alabama, 357 U. S. 449 [78 S. Ct. 1163, 2 L. ed. 2d 1488] (1958), and Barrows v. Jackson, 346 U. S. 249 [73 S. Ct. 1031, 97 L. ed. 1586] (1953), are present here. There is no necessity to exclude evidence against one defendant in order to protect the rights of another. No rights of the victim of an illegal search are at stake when the evidence is offered against some other party. The victim can and very probably will object for himself when and if it becomes important for him to do so.

"What petitioners appear to assert is an independent constitutional right of their own to exclude relevant and probative evidence because it was seized from another in violation of the Fourth Amendment. But we think there is a substantial difference for constitutional purposes between preventing the incrimination of a defendant through the very evidence illegally seized from him and suppressing evidence on the motion of a party who cannot claim this predicate for exclusion."

Both this court and the Federal courts have held that a defendant lacks standing to challenge the search of another person wherein evidence incriminating to the defendant is uncovered.

State v. McConoughey, 282 Minn. 161, 163 N. W. 2d 568 (1968); Sumrall v. United States, 382 F. 2d 651 (10 Cir. 1967).

Defendant suggests that we should abandon a longstanding position on this matter and grant the defendant the right to raise the constitutional objections to the search of a third party. Particularly, defendant refers the court to People v. Martin, 45 Cal. 2d 755, 290 P. 2d 855 (1955), which expanded the California exclusionary rule to protect all persons against whom the evidence was sought to be used. We reject this suggestion and adhere to our prior decisions in this field.

Having determined that defendant has no standing to challenge the constitutionality of the evidence seized from his alleged accomplice, we need not consider in this case constitutional questions relating to the seizure of that evidence. The decision of the trial court is hereby affirmed.

Affirmed.