David T. LYKKEN et al., Plaintiffs,

v.

Edward C. VAVRECK, Esq., Individually
and as Assistant City Attorney of the
City of Minneapolis, et al., Defendants.

No. 4-71 Civ. 269.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 16, 1973.

Duane W. Krohnke, Minneapolis, Minn., and William I. Kampf, St. Paul, Minn., for plaintiffs; John C. Thomas, St. Paul, Minn., of counsel.

Keith M. Stidd, Minneapolis City Atty., by Raymond H. Hegna, Asst. City Atty., for defendants.

NEVILLE, District Judge.

This is a civil damage action, tried to the court with jury waived, brought under the Civil Rights Law, 42 U.S.C. § 1983, for claimed illegal arrest, an unlawful search and seizure, and the violation of other constitutional rights.

The events that give rise to the case occurred late in the evening on Saturday, May 9, 1970, at the home of three of the plaintiffs, David and Harriet Lykken and their teenage son Jesse. The other plaintiffs were all guests in the Lykken home that evening. The numerous defendants are members of the Minneapolis Police Department who participated, to a greater or lesser extent, in the arrest and transportation to jail of the plaintiffs. Plaintiffs were arrested for operating or being present in a disorderly house in violation of a Minneapolis ordinance.[1] Plaintiff David Lykken also later was charged with selling liquor without a license.[2] All charges brought in the Municipal Court of the City of Minneapolis subsequently were dismissed without any convictions being obtained. Plaintiffs have brought this joint action for damages.

Plaintiff David Lykken is a professor at the University of Minnesota. The gathering at his home the evening of May 9, 1970, was in the nature of an "open house", intended to raise money on behalf of an ad hoc group entitled "People Against Missiles", which group recently had been formed by several university students for the purpose of organizing opposition to a proposed anti-ballistic missile installation in or near Nekoma, North Dakota. None of the Lykkens had any direct connection with People Against Missiles; indeed, they apparently were not even acquainted with the group's organizers, plaintiffs Kay Halvorson and Sally Buckley. Through mutual acquaintances, however, it was arranged for the Lykkens, sympathetic to the cause, to make their home available for the May 9th fundraiser.

The idea behind the Saturday evening fundraiser was to have refreshments (beer, coffee, pop) available for those in attendance, which guests would "pay for" in the form of donations to the cause. David Lykken agreed to supply the beer for the fundraiser as his donation, so that any money raised could go to the group's projects and not need be used to defray the expenses of the fundraiser. Accordingly, he bought and had on hand at his home that evening several cases of so-called strong beer, classified under ordinances and statutes as requiring a license for its sale.

The fundraiser was publicized in several ways. Mailing lists of local "peace organizations" were used to mail out postcards. Also, notices were placed in the newsletters of several organizations, informing members of the existence and purposes of People Against Missiles as well as of the fundraiser to be held at the Lykken home. Finally, a mimeographed flyer was distributed at the University of Minnesota. It, too, described the group's purposes as well as inviting the reader to the "party at Harriet and David Lykken's house." In reference to that gathering, the flyer contained the words "donation and cash bar". It appears that all those who actually came to the fundraiser came in response to the post cards or other personal invitation. No one appears, ac-

---

1. Minneapolis Code of Ordinances § 870.140. Participating in a Disorderly House. No person shall own, lease, operate, maintain, reside in, visit or entice or attempt to entice another to reside in or visit, any building or place with knowledge that . . . the unlawful sale of intoxicating liquor or nonintoxicating malt liquor occurs therein. Evidence of the general reputation of such a building or place as one where any of the foregoing occurs shall be prima facie evidence of such knowledge.

2. Minneapolis Code of Ordinances § 851.010. License Required. No person shall sell, exchange, barter, dispose of or keep for sale any liquor, as defined in Section 850.-090, without first having obtained a license as herein provided. All licenses granted under the provisions of this Chapter shall expire on April 1 after issue.

cording to the testimony, to have come on account of the flyer, other than the police. On May 7, 1970, a member of the Minneapolis Police Department came across one of these flyers on the University of Minnesota campus. The next day, May 8, 1970, he gave the flyer to defendant Tidgwell, a member of the police department's Morals Squad. Tidgwell subsequently showed the flyer to defendant Prentice, head of the Morals Squad. Prentice, who was in a hurry to (and did) leave town for the weekend, apparently looked at the flyer only briefly and told Tidgwell to handle it in the usual manner. Tidgwell also consulted with Assistant City Attorney Edward C. Vavreck for an opinion as to whether the flyer would justify the issuance of a search warrant. Vavreck examined the flyer, informed Tidgwell that no judge would issue a search warrant based thereon, and told him to handle it in the usual manner. Vavreck had no further connection until after the events described hereinbelow.

Defendant Tidgwell testified at trial that he was not interested in the political views expressed on the flyer, that his attention was attracted to it simply because of the words "cash bar," that by the location given for the party (in one of the better residential areas of Minneapolis) he knew that no liquor license had been issued for the premises, and consequently that if a cash bar were in fact operated it would be illegal. Thus, when advised to handle the situation in the normal manner, he proceeded to do just that, which meant sending an undercover officer to the scene to attempt to make a purchase. If a purchase were accomplished, an arrest could be made for a misdemeanor committed in the presence of a policeman without a warrant. Accordingly, at the Morals Squad briefing on the evening of May 9, 1970,

Tidgwell showed the flyer particularly to defendants Haertel and Searles, who were working as a team, and told them how the matter should be handled. Haertel and Searles, who, like Tidgwell, were working in plain clothes and not in uniform, had other assignments for the evening but agreed to stop by the Lykken home as they had time.

At about 10:00 P.M., Haertel arrived at the Lykken home, identified himself by name but without revealing that he was a police officer, and was invited in by David Lykken. His partner, Searles, waited in their patrol car, which was parked some distance away. Inside the Lykken home, the fundraiser had been in progress since about 8:00 P.M. The evidence indicated that there were never more than 25 or 26 people at most in attendance at any one time. They apparently engaged in small-group conversation, discussing the antiballistic missile system, how to protest against it, and about politics in general, including an antiwar march that had taken place that afternoon in which a number of the guests had participated. While there were some university students at the fundraiser, most of the guests were middle-aged adults. David Lykken described the party as quiet, even dull and boring; and there is no evidence to the contrary. There was no music or any loud or raucous activity. Of those who had refreshments, some had coffee or pop, others were drinking beer. No wine or hard liquor was consumed or even available.[3] Also in the house were two small baskets for the collection of money. One, in the living room, was labeled "ABM donations"; the other, in the kitchen, near the refrigerator where the refreshments were kept, was labeled "Donations, Beer 50¢, Pop 25¢, Power to the People", or words to that effect. There is evidence that from time to time

3. There was, to be sure, wine and hard liquor on the premises, but it belonged to the Lykkens for their personal use, and it was not offered to the guests at the fundraiser. Indeed, to the contrary, David Lykken testified that he wanted to make sure that he did not incur the expense of serving wine or

hard liquor. The wine was stored in a far corner of the basement, the liquor in a cabinet on the first floor, which cabinet was opened during the evening solely for the purpose of gaining access to an electrical outlet to connect a television set.

during the evening, guests placed money in one or both of the baskets, either spontaneously or at the point of obtaining something to drink. Upon entering the house, Haertel went into the kitchen, where the son Jesse Lykken, who was playing cards with some friends, gave him a beer from the refrigerator. No request for money was made, but Haertel gave Jesse Lykken a marked $5.00 bill for the beer and received change from the basket in the kitchen. At some point later in the evening Haertel obtained another bottle of beer and placed an additional $.50 in coin in the basket.

Haertel stayed at the fundraiser for some time, perhaps as long as an hour. During that time, he engaged in conversation about the antiballistic missile system and the activities of People Against Missiles. He eventually left to rejoin his partner Searles. Haertel reported to Searles, and via police radio to Tidgwell, what had transpired in the Lykken home. Tidgwell asked to meet with them personally at a location about one mile from the Lykken home. Haertel and Searles drove to that location, and in the meantime Tidgwell requested several other officers, including defendants Ottoson, Smith, Shanahan, and Danielson, to meet at the same location. At the police "meet", Tidgwell announced the plan for arresting everyone present at the Lykken home: Haertel and Searles were to, and did, return to the fundraiser and attempt to make a further purchase of beer, the other officers were to follow in about ten or fifteen minutes at which time the arrests would be effected.

Haertel then returned to the Lykken home, this time accompanied by Searles, whom he introduced to David Lykken, but again neither of whom identified themselves as policemen. David Lykken gave them beer from the refrigerator, for which they put a marked bill in the basket. Discovering the refrigerator to be low on beer, David Lykken went to the basement where a reserve supply of beer was kept in a second refrigerator, and brought up several bottles to restock the upstairs refrigerator.

The details of the arrests themselves are not completely clear and the subject of some conflict in the evidence. At approximately the time the arrest was announced, policemen knocked and either were let in or let themselves in at both the front and back doors of the Lykken home. Searles then identified himself as a policeman, though Haertel remained "undercover". Either Searles or Tidgwell then announced that everyone was under arrest. Some of the plaintiffs testified that they were never actually told that they were under arrest, but their status must have been obvious from the situation. All those present in the house were told to gather in the living room. Jesse Lykken, David and Harriet's fifteen-year-old son balked at moving from the kitchen to the living room, and was forcibly pushed there by one or more police officers. At this point, there were between ten and twenty uniformed policemen in and around the Lykken home. While some watched over the arrestees in the living room, others began to search the house. The thoroughness of that search is in dispute, particularly as regards the second floor of the house. The officers testified that they made only a cursory inspection, glancing into the rooms of the second floor to determine if anyone else were obviously present in the house. They came across only the Lykkens' youngest, 10 year old son and allowed him to remain upstairs. Plaintiffs introduced the testimony of next door neighbors of the Lykkens who observed the incident from their own home, tending to indicate from the flash lights they observed that a much more careful search was made of the second floor than that admitted to by the police. In any event, it is clear that an extensive search of the basement was made, for not only did the police seize the remaining beer stored in the refrigerator at the foot of the basement stairs, but they also seized the wine stored in the far corner of a second room in the base-

ment, which wine could not have been discovered but for a very thorough search. On the main floor, defendant Tidgwell seized virtually every piece of paper in sight, including not only People Against Missiles and other anti-war literature that had been placed out for people to read, but also personal papers off a small desk and a substantial pile of papers relating to personal interests of Harriet Lykken that had been placed out of the way of the guests on a built-in buffet in the dining room. While it is clear that it is Tidgwell who began seizing these papers by placing them into a cardboard carton, there is evidence that at least some of the papers were thrown into the carton by an irate and indignant David Lykken who asked sarcastically, "Here, why don't you take these, too?" Tigwell also seized liquor located in a closed cabinet on the first floor and which had not been served to anyone and required the removal of a table to reach.

Each guest at the party was asked for his name and address; the men apparently were not searched, but the women had their handbags searched, albeit in a cursory manner. All guests were then escorted to "paddy wagons" to be taken to the Hennepin County Jail in downtown Minneapolis. While at the Lykken home, the guests had protested the police action, had demanded to see arrest and search warrants (of which there were none), and had sought to take down badge numbers. There was not, however, apart from the incident with Jesse Lykken, any physical resistance to the police nor any attempt to flee. By the same token, it appears that the police, apart from pushing Jesse Lykken and except for a somewhat heated exchange of words between David Lykken and Tidgwell, behaved in a respectful manner. All of the plaintiffs were taken downtown, except for Harriet and Jesse Lykken who were issued citations similar to traffic tickets. Even defendant Haertel, who still had not revealed his true role, was taken downtown in the same squad car as David Lykken. At the Hennepin County jail, the plaintiffs were booked, charged with participating in a disorderly house, fingerprinted, photographed, and then released after periods of detention ranging from 37 minutes to 5 hours. Upon arriving downtown with the seized property, Tidgwell notified the local office of the F.B.I. concerning the identity of those arrested and the political nature of the literature seized. The F.B.I. agent, however, stated he had no reason to be interested in the matter and Tidgwell was so informed. There was no further F.B.I. involvement. Plaintiffs subsequently each appeared in Hennepin County Municipal Court once or twice, but all charges were eventually dismissed. The Municipal Court judge the Honorable David Leslie found there was no probable cause to charge plaintiffs with presence in or participation in a disorderly house and dismissed all complaints except the complaint against David Lykken for selling liquor without a license, for lack of probable cause. The memorandum attached by the Municipal Court judge to his order dated September 11, 1970 recites in part:

> In at least three cases the Minnesota Supreme Court has considered Minneapolis City Ordinances relating to a disorderly house. In State vs. Reckards, 21 Minn. 47 (1874), the Court indicated that a disorderly house requires more than a single incident by the following statement:

>> "As to the first ground, it may be doubted whether the permitting of acts of disorder for a single day, and no longer, would make the place of their occurrence a "disorderly place" . . . within the meaning of the ordinance. But if a place has acquired a character as disorderly, from the fact that acts of disorder have been commonly permitted therein for a considerable space of time, say for several days or weeks, the keeping of the same as a disorderly place for a single day is a violation of the ordinance."

Again in 1920 in State vs. Namick, [Nanick] 144 Minn. 413, 175 N.W. 693 (1920), the Court noted:

"To establish the offense of keeping a disorderly house it must appear that acts injurious or offensive to the public are habitually permitted on the premises, or that the house is conducted as a place to which people may and do resort for the purpose of indulging in immoral or unlawful practices."

In 1942 in State vs. Glenny, 213 Minn. 177, 6 N.W.2d 241 (1942), the Court relying on its previous decisions, stated:

"The commission of single or isolated disorderly or immoral acts on the premises does not constitute the place a disorderly house within the meaning of the penal laws.

. . . this being so and there being no evidence as to the character or reputation of the place, we believe that the State has failed to sustain the conviction of defendant Glenny . . ."

In the present case the complaints, the examination before the Magistrate, the affidavits of the Police Officers, Haertel and Tidgwell, and the transcript of the proceedings before the undersigned, are devoid of any reference to the essential elements necessary to prove the charges of operating or participating in a disorderly house. Although counsel for the State refers to defendant as an "alleged moonshiner," the facts are there is no indication before the Court that anyone ever knew of this home before, that it had a reputation as a disorderly house, or that it was under surveillance as a disorderly house or that this gathering was anything more than a single occurrence or that the invitees had any knowledge that this was a disorderly house or had a reputation as one.

There is no indication that there was in operation any kind of commercial venture and it is sheer nonsense to equate this meeting with the ordinary tippling house raid, which in my seven years experience on this Bench has usually involved clearly distinguishable fact situations. Moreover, the flyer which openly announced the meeting to be held is quite similar to the kind of invitation most of us observe or receive from candidates for political office from both political parties and from those running without political party designation, or from fund raisers, for various causes. The only difference being the politically sophisticated avoid such words as "cash bar" and substitutes words as refreshments and donations. .. . .

Were the court to regard this as res judicata or estoppel by verdict in some way, it is clear that the inquiry by this court as to liability could stop here, for an arrest without probable cause augurs for civil liability.

None of the parties so argued, however, and it is true that different parties here are involved and the issues are not necessarily the same as those presented in the criminal cases in Municipal Court.

■ The charge of selling liquor without a license against David T. Lykken was dismissed without any memorandum "on the grounds of no prima facie case" by Honorable Donald S. Burris, another Municipal Court Judge, on December 24, 1970. It is of course axiomatic that mere failure to obtain a criminal conviction does not per se establish by hindsight that there was no probable cause for an arrest.

In their complaint, plaintiffs allege a cause of action for conspiracy under 42 U.S.C. § 1985. No evidence was presented, however, tending to indicate the existence at least of any overt conspiracy, and the claim is not argued in plaintiffs' post-trial brief. Accordingly, the conspiracy count is dismissed as to all defendants.

■ To prove their cause of action under 42 U.S.C. § 1983, plaintiffs must show (1) action taken under color of state law and (2) a resulting depriva-

tion of rights, privileges, or immunities secured by the Constitution or by federal law. See a previous opinion in this same case, Ames v. Vavreck, 356 F.Supp. 931, 939 (D.Minn.1973), and cases cited therein. It is not disputed that the actions of defendants in question here were taken "under color of state law." Thus, the only question to be determined on the issue of liability is whether those actions resulted in the deprivation of plaintiffs' constitutional rights.

This case is, at bottom, a Fourth Amendment case. The Fourth Amendment guarantees the right of the people "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures". Obviously this protects against unreasonable seizure of one's person, including arrest, as well as papers and has many times been so held. Plaintiffs further have alleged violations of their First, Ninth and Fourteenth Amendment rights, but it is clear that any violations of constitutional rights are bound up in the fact of the arrests, searches, and seizures themselves. The starting point in determining the validity of those arrests, searches and seizures must be the Fourth Amendment.

■ For all but the three Lykken plaintiffs, the determination of the validity of the arrests is the only issue that needs to be resolved, for, apart from Harriet, David and Jesse Lykken, it is clear that the searches of the plaintiffs (checking coat pockets, glancing into handbags) were well within the permissible scope of a search incident to a valid arrest. See Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). If the arrests were valid, then so were the searches. As to Harriet, David and Jesse Lykken, however, the case is much different. It is conceded that the police had no search warrant for the Lykken home. If the extensive search of the premises and of the Lykkens' personal effects is to be justified at all, it can only be as a search incident to a lawful arrest. But even if the arrests were valid, a question reached below, it is clear that the search of the Lykken premises was well beyond that allowed by *Chimel* for searches incident to a valid arrest and cannot be included within any other exception to the constitutional requirement of a search warrant. Having in mind that this was not a typical tippling or disorderly house, where the rule might be expanded, *Chimel* clearly under the facts of this case limited the arresting officer to a search of the area within the immediate control of the arrestee. The purpose of allowing the search is to prevent the arrestee from gaining possession of a weapon or destructible evidence; if the search is to go any further, it must be supported by a warrant, and such was not the case here. There was no probable cause, much less a warrant, to justify the extensive search into the furthest, darkest corners of the Lykken basement, and Tidgwell's wholesale seizure of papers in the dining room was just that sort of "[rummaging] at will among [a man's] papers in search of whatever will convict him" that was condemned in *Chimel*, quoting from an opinion by Judge Learned Hand in United States v. Kirschenblatt, 16 F.2d 202 (2d Cir. 1926). Accordingly, we hold that the search violated the Lykkens' rights under the Fourth Amendment.

■■ As for the arrests themselves, the defendants maintain that there was probable cause for the arrests; that since the alleged law violations occurred in the presence of a police officer there was no need for a warrant; and that given the existence of probable cause, there can be no civil liability on the police simply because the charges were later dismissed, citing Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). This court does not believe, however, that the consideration of the case could end with a finding that in some technical, abstract sense the arrests were supported by "probable cause." Such an approach would be a too narrow, isolated view and would foreclose consideration of what, on the particular facts presented here, is a vi-

tally important factor, the factor of police motive. *Cf.* Beauregard v. Wingard, 230 F.Supp. 167, 183 (S.D.Cal.1964):

> In determining what constitutes lack of 'due process' we think that 'motive' should and does bear heavily in cases under Section 1983, 42 U.S.C.A. where police officers are involved, though specific intent to deprive a person of a specific constitutional right need not be present.

For example, police motive often is important in determining the validity of a search incident to an arrest, for if the arrest was merely a pretext to justify the search, then the search is unconstitutional. Jones v. United States, 357 U. S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); Taglavore v. United States, 291 F.2d 262 (9th Cir. 1961); United States v. Jones, 452 F.2d 884 (8th Cir. 1971); United States v. Sanchez, 412 F.2d 1177 (5th Cir. 1969); Amador-Gonzalez v. United States, 391 F.2d 308 (5th Cir. 1968); United States v. Harris, 321 F. 2d 739 (6th Cir. 1963). It has even been held in such circumstances that not only is the search unconstitutional but also the *pretext arrest itself* is invalid. Taglavore v. United States, *supra*; Blazak v. Eyman, 339 F.Supp. 40 (D.Ariz. 1971); United States v. Frazier, 304 F. Supp. 467 (D.Md.1969), aff'd sub nom., United States v. Webster, 426 F.2d 289 (4th Cir. 1970), cert. denied, 402 U.S. 986, 91 S.Ct. 1676, 29 L.Ed.2d 152 (1971); United States v. One 1963 Cadillac Hardtop, 224 F.Supp. 210 (E.D.Wis.1963). The conclusion is inescapable that the arrests here in question were improperly motivated, undertaken not in furtherance of good faith law enforcement but for the purpose of harassing those at the gathering because of their political beliefs, and the arrests were thus illegal. The extent of the search of the premises incident to the arrests plus Tidgwell's inquiry to the F. B.I. concerning the seized papers further indicate that the police were interested not in good faith law enforcement but in using the arrests as a pretext for seizing any and all potentially damning evidence of any possible law violation that might serendipitously be turned up. Accordingly, the court need not reach the question of the existence *vel non* of probable cause, since it is not necessary for the result. The Fourth Amendment protects the people of this nation against unreasonable searches and seizures. Under all the circumstances the activities of the Minneapolis police at the David Lykken home on the evening of May 9, 1970, were unreasonable, and thus a violation of plaintiffs' constitutional rights.

█ This court has great respect for the willingness of police officers to undertake the dangerous, difficult, indeed sometimes impossible tasks which society demands of them and has no desire to make those tasks even more difficult than already they are. The policeman on patrol cannot be held to the same standard in his decision-making as the courts apply in the detached and ordered atmosphere of a trial. Accordingly, a policeman is protected from civil liability for an arrest, as the court believes he should be, even though there was no probable cause for the arrest, so long as the policeman had a reasonable, good faith belief in the existence of probable cause. See Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) and Bivens v. Six Unknown Named Agents, 456 F.2d 1339 (2d Cir. 1972). See also Jones v. Perrigan, 459 F.2d 81 (6th Cir. 1972); Rodriguez v. Jones, 473 F.2d 599 (5th Cir. 1973), and Hill v. Rowland, 474 F.2d 1374 (4th Cir. 1973). Minnesota law is in accord on this point. See, *e. g.*, State v. Bruno, 293 Minn. 84, 90, 196 N.W.2d 459, 463 (1972), where the court stated:

> The basis for testing the actions of the arresting officer as to the issue of probable cause must be one of reasonableness and cannot be overly technical, especially when viewed from the lofty height of hindsight.

See also State v. Cox, 294 Minn. 252, 256, 200 N.W.2d 305, 308 (1972):

> We recently summarized in State v. Bruno, [293 Minn. 84] 196 N.W.2d

459 (1972), the standards which govern our review of a police officer's on-the-spot assessment of probable cause for a warrantless arrest. As there stated, we must decide each case on its own facts, guided not by any magic formula but by the standard of reasonableness. In applying this standard we should not be overly technical and should accept the officer's probable-cause determination if reasonable and prudent men, not legal technicians, would under the same circumstances make the same determination.

■■ But just as it is necessary to judge police conduct by a standard of reasonableness in order to protect the police from unwarranted claims of civil liability, it is the opinion of this court that police conduct must likewise be judged against a standard of reasonableness where it is necessary to do so in order to protect the private citizen. Thus, it becomes important to examine the particular facts of the case at hand. The most striking fact about the incident at the Lykken home is that it clearly was *not* the "stressful and unstable situation calling for discretion, speed, and on-the-spot evaluation" that has been held to justify a "reasonableness" standard for policemen. See Whirl v. Kern, 407 F.2d 781, 790 (5th Cir.), cert. denied, 396 U.S. 901, 90 S.Ct. 210, 24 L. Ed.2d 177 (1969). The situation did not present the threat of imminent violence, a fleeing suspected felon, a sensitive confrontation in a ghetto neighborhood, or any other of the myriad situations in which a policeman must make split-second decisions based on his own experience and good judgment and cannot be expected to decide complex and intricate questions of constitutional law. Indeed, the fundraiser at the Lykken home was not even similar to and was far from the typical tippling house at which the ordinances in question are directed; it was no wee-hours furtive gathering in the darkened basement of a private home, publicized by small slips of paper silently passed from hand to hand in bars near closing time. Not only did the police have more than 24 hours advance notice of the planned party, there was actually an undercover agent in attendance at the party for an hour or more. The nature of the gathering must have been apparent to Haertel: it was not exclusively or even primarily a drinking party; there was no illegal, loud, or raucous activity; in fact, to the contrary, the party was quiet and orderly; the house was, in effect, open to the public, including policemen; there were no complaints from the neighbors or anyone else. It cannot possibly have seemed reasonable to call in between 10 and 20 uniformed policemen to haul these particular plaintiffs to jail, under all the circumstances. The police could only have been motivated by a desire to harass the guests at the fundraiser, and/or attempt to set an example for others who might stage antiwar gatherings.

The result reached is further supported by the Supreme Court's holding in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). That case held that "the defense of good faith and probable cause . . . is also available to [police officers] in the action under § 1983." 386 U.S. at 557, 87 S.Ct. at 1219. In other words, a police officer cannot be held liable under § 1983 if he acted in good faith *and* with probable cause. As is discussed above, the probable cause requirement has been interpreted to mean a *reasonable belief* in the existence of probable cause; and normally, where there exists such a reasonable belief, there is also, by definition, good faith. But such circular reasoning cannot obscure the fact that two factors must be present to establish a valid defense: good faith *and* probable cause. The Supreme Court spoke in the conjunctive, not the disjunctive, clearly indicating that both factors are necessary. See Comment, Federal Comity, Official Immunity, and the Dilemma of Section 1983, 1967 Duke L.J. 741, 804 n. 290.

The court finds that the police action, what amounted to a raid on a peaceful,

595

quiet, legal gathering, was not a good faith effort at law enforcement.

It has been plaintiffs' contention that the police department's real purpose in sending an undercover agent to the fundraiser and in effecting the arrests was to engage in surveillance of these plaintiffs and to uncover information about their political and protest activities. There is, however, no direct evidence to support the contention that the police were so motivated. Nevertheless, even if the police were not interested in obtaining information, the inference is inescapable that the raid was undertaken as a harassment tactic, because of plaintiffs' political beliefs. Such a purpose is, of course, antithetical to the First Amendment to the Constitution and the fundamental principles of a free society and will not be condoned. Had the police truly been interested in preventing violations of the law, there was no reason they could not have notified the fundraiser's sponsors on the day before the party of the possible illegality of the planned activities. There was some testimony that at one time this had been the policy of the police in cases like this where citizens are obviously unwittingly and innocently walking into a situation where one or some of them may be violating the law. In a sense the police stood by and let plaintiffs trap themselves.[4] There is every reason to believe that an advanced telephoned notification would have received full cooperation. Or if the police did not pursue such a course of action for fear that it would only engender defiance and an organized confrontation, then surely their fears should have been laid to rest by Haertel's undercover observations. Even if Haertel thought it necessary that these plaintiffs be brought before the bar of justice, surely it would have been sufficient to send a small detail of police to take names and addresses and issue citations, as in fact was done with

Harriet and Jesse Lykken, rather than taking the group into custody.

The result here does not simply reflect the court's ideas about proper police administration. Rather, the requirements of the Fourth Amendment, based as they are on the necessary qualities of a civilized society, dictate that such police overkill as occurred here should not be tolerated. See, e. g., Bivens v. Six Unknown Named Agents, 456 F.2d 1339, 1348 (2d Cir. 1972), where the court held that good faith and reasonableness must support not only the fact of the arrest itself but also "the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted."

This court takes judicial notice of the fact that there have been and continue to be numerous examples throughout the country of police misconduct more heinous and of injuries more severe than what is in question here. Often such conduct goes unredressed, for it is perpetrated on those with neither the political awareness nor the resources of the plaintiffs here involved. But that is neither an answer nor a defense, and it certainly would not justify condoning the police treatment of these plaintiffs.

By the decision today, the court does not mean to pave the way for every suspect ever arrested to bring a § 1983 action against the police. All policemen must necessarily be given a wide range of discretion. This is especially true of the patrolman on the beat or in a squad car who is continually faced with the necessity for making quick decisions, often in dangerous circumstances, that individually and taken together may have a profound impact on the individuals involved and on the entire community, especially in its attitude toward the police and law enforcement. But a different standard must be applied to decisions that are made only after an opportunity for deliberation and reflec-

4. The court of course realizes that in the true tippling or disorderly house case, it would not be a good law enforcement prac-tice to call and notify in advance of a prospective raid for indeed, on later arrival, undoubtedly no violation would be found.

**596**

tion. This case presents a flagrant example not only of extraordinarily bad judgment, but it is something more than innocent bad judgment. Tidgwell in his decision to investigate and raid the fundraiser and in his conduct of the searches after Haertel had had ample time to observe the true nature of the gathering first hand, taken together with the entire episode, presents a blatant disregard for the constitutional rights of these plaintiffs. On the particular facts presented here, the court cannot excuse the police conduct, and accordingly finds for the plaintiffs.

 This brings the court to the question of compensatory damages. Plaintiffs seek to recover compensatory damages in the amount of $10,000 each for David and Harriet Lykken, $5,000 for Jesse Lykken, and $2,500 for each of the other plaintiffs. Plaintiffs have failed, however, to prove any out-of-pocket or consequential losses.[5] There is no evidence that any plaintiff lost his job or suffered a reduction in salary by reason of defendants' action. It is conceded that no one suffered any physical injury and that no one sought or received medical or psychiatric treatment as a result of the incident. Nevertheless, it is clear that the plaintiffs suffered emotional distress and were subjected to a great deal of public embarrassment by reason of defendants' actions. The odium of being found in a disorderly house usually is associated in the public mind with prostitution or at least some sort of an after hours drinking and perhaps gambling establishment. To have one's name spread across the front pages of the newspapers and on the news media a number of times against such a charge is grossly embarrassing to say the least. Compensatory damages may, of course, be awarded for such mental and emotional distress. See Donovan v. Reinbold, 433 F.2d 738 (9th Cir. 1970), and cases cited therein; McArthur v. Pennington, 253 F.Supp.

420 (E.D.Tenn.1963). Indeed, an award of damages may be made simply for the deprivation of constitutional rights. Basista v. Weir, 340 F.2d 74 (3d Cir. 1965). The situation seems doubly aggravated as to the three Lykken plaintiffs at whose home the events occurred and whose names appeared in every news item. Accordingly, the court awards jointly and severally against defendants Haertel, Tidgwell and Searles compensatory damages of $500 to each of the plaintiffs other than the three Lykkens and $1,000.00 as to each of them.

 Plaintiffs pray in addition for punitive damages. It is well established that punitive damages are also an available remedy in an action under § 1983. Such damages may be awarded where the defendants have acted wilfully and in gross disregard for the rights of the complaining party (Lee v. Southern Home Sites Corp., 429 F.2d 290 (5th Cir. 1970)), otherwise characterized as "willful or malicious violations of Constitutional rights" (Sexton v. Gibbs, 327 F.Supp. 134 (N.D.Tex.1970), aff'd, 446 F.2d 904 (5th Cir. 1971), cert. denied, 404 U.S. 1062, 92 S.Ct. 733, 30 L.Ed.2d 751 (1972)), or where the defendants have acted in bad faith or for an improper motive, even though behaving like gentlemen (Caperci v. Huntoon, 397 F.2d 799 (1st Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968)).

 The court is convinced that the evidence is more than sufficient to support an award of punitive damages as to David, Harriet and Jesse Lykken in this case. Indeed, the evidence compels the conclusion that the defendants here acted in bad faith, for an improper motive, and in gross disregard for the constitutional rights of the plaintiffs. While the raid may have been carried out, for the most part, in an orderly manner, the fact that the raid occurred at all is inexcusable. Citizens in a free society have

---

5. One plaintiff testified he lost one day at work. Otherwise no actual damages were established.

the right to expect that they may gather to discuss politics and to raise money for political projects without being harassed by the police. The wholesale seizure of all papers in sight, personal and otherwise, the search of the house, including particularly the basement, the seizure of closeted liquor not being served or available were wilful acts unauthorized and clearly illegal. Accordingly, the court finds it appropriate to award punitive damages to plaintiffs David, Harriet and Jesse Lykken, as an example to others that this society, through its courts, will protect the cherished rights given all citizens by the Constitution. The Lykkens shall each recover by way of punitive damages the sum of $2,500.00 jointly and severally from the defendants Tidgwell, Haertel and Searles.

Plaintiffs ask for attorneys' fees, seeking to recover as part of their compensatory damages the attorneys' fees for their representation. Two separate measures of attorneys' fees should be kept distinct for a proper resolution of the question. One measure would be the fees for representing the plaintiffs in the criminal proceedings in Hennepin County municipal court which resulted from plaintiffs' being arrested on May 9, 1970. Those fees would be recoverable, if at all, as an element of the damages awarded to plaintiffs by reason of defendants' illegal actions. The other, and entirely distinct, measure would be the attorneys' fees *in the instant action.*

■■■ It is conceded that in reality none of the plaintiffs has incurred any attorneys' fees whatsoever. At all times since the arrests, plaintiffs have been represented by attorneys donating their time under the auspices of the Minnesota Civil Liberties Union. Neither the Minnesota Civil Liberties Union nor the plaintiffs have incurred any obligation to pay the attorneys; indeed, to the contrary, as the court is informed by counsel, lawyers working under the auspices of the Minnesota Civil Liberties Union *must* donate their time and are not permitted to accept fees for that work.

This court has no quarrel with the proposition that attorneys' fees actually incurred in a criminal proceeding as a foreseeable result of the defendant's acts may well be properly recoverable as an element of actual damages in an action under § 1983. Kerr v. City of Chicago, 424 F.2d 1134 (7th Cir.), cert. denied, 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 64 (1970); McArthur v. Pennington, 253 F.Supp. 420 (E.D.Tenn.1963). But where no payment of attorneys' fees has been made, where there is no obligation to pay attorneys' fees, and where it was understood from the beginning that the attorneys would receive no compensation, as was the case here, it can hardly be said that "attorneys' fees" should be allowed as an element of actual damages. Accordingly, the court makes no award in this case for attorneys' fees in the prior criminal proceedings. Kerr v. City of Chicago, *supra,* does not hold to the contrary. In that case, there had actually been an expenditure for attorneys' fees, albeit not by the plaintiff but by his parents.

This brings the court to the question of whether attorneys' fees in the instant action should be taxed as costs. The question of the propriety of an award of attorneys' fees in a § 1983 action has never been decided by the Supreme Court. See Northcross v. Board of Education, 412 U.S. 427, 429, n. 2, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973). It is plaintiffs' contention that the fact that they have not paid any attorneys' fees should not bar such an award, citing Miller v. Amusement Enterprises, Inc., 426 F.2d 534 (5th Cir. 1970). While it is true that in the Miller case an award of attorneys' fees was allowed even though plaintiffs had no obligation to pay, it appears that the award of attorneys' fees would actually be used to compensate the attorneys. Here that is impossible since the attorneys are precluded from accepting any compensation. It should be made clear that "the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual au-

thorization." Hall v. Cole, 412 U.S. 1, 4, 93 S.Ct. 1943, 1945, 36 L.Ed.2d 702 (1973). Section 1983 makes no such statutory authorization, and the rule in the Eighth Circuit appears to be that statutory authorization cannot be found by analogy to like statutes. See Kemp v. Beasley, 352 F.2d 14, 23 (8th Cir. 1965). Nevertheless, federal courts have the inherent power to award attorneys' fees "whenever 'overriding considerations indicate the need for such a recovery.'" Hall v. Cole, *supra*, 412 U.S. at 5, 93 S.Ct. at 1946, quoting Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391–392, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). The cases in which the courts allow attorneys' fees without statutory or contractual authorization fall within three general categories, clearly set forth in La Raza Unida v. Volpe, 57 F. R.D. 94 (N.D.Cal.1972). These categories are known as the "obdurate behavior" or "bad faith" exception, the "common fund" exception, and the "private attorney general" exception. The first exception is used primarily as a punitive measure, where the unsuccessful party's bad faith, either in the action that necessitated litigation or in his conduct of the litigation itself, makes it just and appropriate to award the prevailing party his attorneys' fees. This case might conceivably fit within the "bad faith" exception, but this court cannot justify an award of "attorneys' fees" on any basis where the same are nonexistent. The second exception works to award attorneys' fees out of a common fund where plaintiff's action has resulted in an award to a large class of people. The idea is to assure that everyone who benefits from the litigation has shared in its expense. Here no common fund has been created, and the exception clearly does not apply. The last of these exceptions applies where it is necessary to award attorneys' fees as an incentive to private parties to bring an action which will effectuate strong congressional policy and benefit a large number of people but may not promise any monetary return to the plaintiffs. In this case such an incentive obviously is not needed, since the attorneys undertook to represent plaintiffs knowing full well that they would not be compensated.

The plain fact is that the attorneys herein have willingly and purposefully agreed to serve without remuneration and so under the circumstances, there is no "overriding consideration" that might make an award of attorneys' fees proper despite the general rule. Nor is this a typical pro bono publico case where a particular plaintiff, a taxpayer for instance, has little to gain personally but establishes a principle. Here plaintiffs are acting only for themselves and are gaining personally by an award of damages.

■ The court does not mean to discourage the bringing of § 1983 actions, at least where such are not frivolous or brought for vexatious purposes. Public policy requires that citizens be encouraged to bring meritorious actions, even if there is no prospect of a large monetary recovery (see Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972), and Donahue v. Staunton, 471 F.2d 475 (7th Cir. 1972), cert. denied, 410 U.S. 955, 93 S. Ct. 1419, 35 L.Ed.2d 687 (1973)), and likewise potential plaintiffs should not be dependent on their ability to find a lawyer willing to work at no charge. Were the circumstances of this case different, the result on the question of attorney's fees might be different, but on the particular facts presented here, such an award would not be appropriate.

Plaintiffs as other appropriate relief have asked this court to order an expungement of all arrest records relating to the arrests of plaintiffs herein on May 9, 1970, citing the broad remedial power of a federal court where violations of constitutional rights have been established. Counsel for defendants, who is also Assistant City Attorney for the City of Minneapolis, has indicated that he would have no objection to the issuance of such an order. In view of this stipulation, the court need not decide whether it has the power to issue an expungement order, even though the

records are state records and not federal records. See Wilson v. Webster, 467 F.2d 1282 (9th Cir. 1972); Sullivan v. Murphy, 478 F.2d 938 (D.C.Cir.1973), and cases cited therein. Under the circumstances, this is clearly an appropriate case to order the Minneapolis Police to expunge the records of these illegal arrests in order to minimize the harm to plaintiffs resulting from the violations of their constitutional rights. The court does not assume however to affect Municipal Court records, leaving any such action to that court's discretion and application of its rules.

While all the defendants were involved to one degree or another in the raid at the Lykken home, the court is persuaded that they should not all be held liable to the plaintiffs. A number were dismissed at trial, there being no satisfactory evidence that they knew anything or very much about the raid or its purposes until called by radio to appear at the Lykken residence.

Defendant Prentice, as head of the Morals Squad, admittedly was not present and was out of the city on May 9, 1970. It is clear that he has no responsibility on the basis of *respondeat superior*. See Ames v. Vavreck, 356 F.Supp. 931 (D.Minn.1973), and cases cited therein. The question then is whether Prentice can be said to have participated in one way or another by his conversation with Tidgwell before leaving town. The court does not believe this is sufficient evidence to attach liability to him. Further there can be no liability for administrative negligence or malfeasance, as there is no showing that Prentice knew or should have known that Tidgwell, Haertel and Searles would conduct such a raid as occurred here. Accordingly, the case is dismissed as to defendant Prentice.

Of the remaining defendants, it appears that Danielson, Jensen, Ottoson, Shanahan, and Smith did not have primary responsibility for the raid and should not bear liability. They did not actually effect the arrests, but merely assisted with the taking of names and escorting the arrestees to the paddy wagons. The evidence is that they behaved in a proper manner at all times. The evidence is unclear as to who actually made the searches at the Lykken home, but it is not necessary to make that precise determination. For it appears to the court that as to these five defendants the searches might have been proper had the circumstances been as these defendants were led to believe. These five defendants had no first-hand knowledge of what had transpired at the Lykken home earlier that evening. They knew only what Tidgwell told them, and they were acting under his directions, directions which, at least, were not clearly illegal. There is no evidence that they shared or were even aware of the improper motives that lay behind the actions of the others. Since they did not know and had no reason to know that under the circumstances as they actually existed their actions were illegal, the case is dismissed as to them.

It is on Tidgwell, Haertel and Searles that responsibility for the raid must finally come to rest. Among them they instigated, planned, and directed the raid, with either Tidgwell or Searles actually effecting the arrests. They had first-hand knowledge of the true nature of the gathering at the Lykken home and were the only ones who effectively might have and should have prevented the raid from happening. Their decision to go ahead with the arrests in light of what they actually knew not only evidences bad judgment in terms of effective use of police manpower but more importantly displays a callous disregard for the constitutional rights of others who may have been of a different political persuasion. Such activity on the part of those whose job it is to enforce the law will not be tolerated, and these three defendants must now bear the liability for their decisions.